- **REVISED**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-20792
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANK LAFAYETTE BIRD,

Defendant-Appellant.


_____

Appeal from the United States District Court for the
Southern District of Texas
_____
September 24, 1997

Before GARWOOD, DAVIS and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

Appellant, an abortion protester, appeals his conviction for violating the Freedom of Access to Clinic Entrances Act. He challenges the authority of the Congress to enact a statute under the Commerce Clause that proscribes intrastate, noncommercial activity and he raises First Amendment challenges to the scope of the Act and to the terms of his supervised release. Because we find that there was a sufficient basis for the Congress to have determined that the activity proscribed by the Act, though intrastate, could have a substantial affect on the congressionally-recognized national market for abortion-related services, and

because we find that the Act, as applied, is neither unduly vague nor overbroad, we affirm the judgment of the district court. We also find that the district court did not abuse its discretion when it set the terms of appellant's supervised release.

**Facts and Proceedings Below**

The facts are few and undisputed. On December 13, 1994, appellant Frank Bird (Bird), while protesting outside the America's Women Clinic in Houston, Texas, threw a bottle at a car driven by Dr. Theodore Herring (Herring), an abortion provider, as he attempted to enter the clinic premises. As Bird threw the bottle, he yelled, "Herring, I'm going to get you. I'm going to kill you." Although Dr. Herring was not physically injured, the bottle shattered the windshield of his car. Employees of the clinic subsequently called the police, who arrived at the scene and arrested Bird.

On March 29, 1995, Bird was charged in a one-count indictment with violating 18 U.S.C. § 248(a)(1), the provision of the Freedom of Access to Clinic Entrances Act (FACE or the Act) that criminalizes certain threats and intimidation directed at providers of abortion services.

The case was tried on June 12, 1995. The jury returned a guilty verdict the same day. On September 14, 1995, the district court sentenced Bird to imprisonment for one year followed by one year of supervised release with the special condition that he stay at least one thousand feet from any abortion clinic, specifically the America's Women Clinic in Houston. The district court also

2

ordered Bird to pay $820.67 in restitution and ordered an assessment of $50.

Bird filed a timely notice of appeal. Although Bird challenges the constitutionality of the Act, he does not otherwise contest his guilt under the statutory scheme. He also objects to the wording of the district court's judgment and the terms of his supervised release. We affirm.

## Discussion

Some four years ago, this Court, emphasizing the Constitution's establishment of a national government of limited and enumerated powers—in which the powers of the federal government were designed to be "'few and defined'"—held that Congress, by enacting a statute making it a federal crime to possess a firearm in a school zone, had exceeded its authority under the Commerce Clause. *United States v. Lopez*, 2 F.3d 1342, 1345 (5th Cir. 1993) (quoting *The Federalist* No. 45, at 292 (C. Rossiter ed. 1961), *aff'd*, 115 S.Ct. 1624 (1995). This case calls on us to visit again the issue of Congress's authority to regulate *intra*state activity pursuant to its Commerce Clause authority, this time aided by more recent clarifying Supreme Court authority. As with any challenge to the constitutional validity of an act duly passed by Congress, we approach our task knowing that it is both "the gravest and most delicate duty that this Court is called on to perform," *Blodgett v. Holden*, 48 S.Ct. 105, 107 (1927) (Opinion of Holmes, J.), and that it "forms one of the most powerful barriers which has ever been devised against the tyranny of political assemblies," Alexis de

3

Tocqueville, *Democracy in America* 76 (1956, Richard D. Heffner ed.).

In 1994, reacting to a perceived nationwide problem of violent protests and blockades directed at both providers and recipients of abortion services, Congress enacted the Freedom of Access to Clinic Entrances Act, an act making it a federal crime to engage in certain prohibited activities interfering with the provision or obtainment of "reproductive health services."  Specifically, the Act provides:

> "(a)  **Prohibited activities.**--Whoever--
> (1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services;
> . . . .
> shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor."   18 U.S.C. § 248(a)(1) (West Supp. 1997).[1]

---

[1]    The Act defines several of its terms.  "Facility" is defined to include "a hospital, clinic, physician's office, or other facility that provides reproductive health services, and includes the building or structure in which the facility is located."  18 U.S.C. § 248(e)(1).  "Interfere with" means "to restrict a person's freedom of movement."  *Id.* § 248(e)(2).  "Intimidate" means "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." *Id.* § 248(e)(3).  "Physical obstruction" means "rendering impassable ingress to or egress from a facility that provides reproductive health services . . . or rendering passage to or from such a facility . . . unreasonably difficult or hazardous." *Id.* § 248(e)(4).  "Reproductive health services" means "reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counseling or referral services relating to the human

The Act itself states that it was passed "[p]ursuant to the affirmative power of Congress to enact . . . legislation under section 8 of article I of the Constitution, as well as under section 5 of the fourteenth amendment to the Constitution." Freedom of Access to Clinic Entrances Act of 1994, Pub. L. No. 103-259, § 2, 108 Stat. 694, 694. Although the Act itself does not contain congressional findings, the "Joint Explanatory Statement of the Committee of Conferees" to Senate Bill 636, which was ultimately adopted as the Act, sets forth a number of relevant findings.[2]

---

reproductive system, including services relating to pregnancy or the termination of a pregnancy." *Id.* § 248(e)(5).
    Criminal penalties under the Act depend upon whether the offense involved violence and upon whether the offender has previously violated the Act. *Id.* § 248(b).

[2]      "2. FINDINGS AND PURPOSE

    The Senate Bill, but not the House Amendment, contains a Congressional Statement of Findings and Purpose.
    The House recedes with an amendment. The amendment deletes the Findings but incorporates a portion of them in the Purpose section. The Conferees note that Congress has found:
    (1) *An interstate campaign* of violent, threatening, obstructive and destructive conduct aimed at providers of reproductive health services *across the nation* has injured providers of such services and their patients, and the extent and interstate nature of this conduct place it beyond the ability of any single state or local jurisdiction to control;
    (2) Such conduct, which has included blockades and invasions of medical facilities, arson and other destruction of property, assaults, death threats, attempted murder and murder, infringes upon the exercise of rights secured by federal and state law, both statutory and constitutional;
    (3) *Such conduct also burdens interstate commerce by forcing patients to travel from states where their access to reproductive health services is obstructed to*

5

Bird makes a number of arguments challenging the constitutionality of the Act. First, he argues that section 248(a)(1) was beyond the authority granted to Congress under either

---

*other states, and by interfering with the interstate commercial activities of health care providers, including the purchase and lease of facilities and equipment, sale of goods and services, employment of personnel and generation of income, and purchase of medicine, medical supplies, surgical instruments and other supplies from other states;*
    (4) Prior to the Supreme Court's decision in *Bray v. Alexandria Women's Health Clinic*, 113 S.Ct. 753 (1993), the conduct described in paragraphs (1) through (3) above was frequently enjoined by federal courts in actions brought under 42 U.S.C. 1985(3), but in that case the Court denied a remedy under such sections to persons injured by the obstruction of access to abortion-related services; and
    (5) Violent, threatening, obstructive and destructive conduct aimed at providers of reproductive health services can be prohibited, and the right of injured parties to seek redress in the courts can be established, without abridging the exercise of any rights guaranteed under the First Amendment to the Constitution or under any other law." H. Conf. Rep. No. 103-488, at 7-8 (1994), *reprinted in* 1994 U.S.C.C.A.N. 724, 724-25 (emphasis added).
S. 636, as passed by the Senate, contained additional, more detailed findings that were ultimately not included in the Conference Committee report, some of which are as follows:
    "(8) the entities that provide pregnancy or abortion-related services engage in commerce by purchasing and leasing facilities and equipment, selling goods and services, employing people, and generating income;
    (9) such entities purchase medicine, medical supplies, surgical instruments, and other supplies produced in other States;
    (10) violence, threats of violence, obstruction, and property damage directed at abortion providers and medical facilities have had the effect of restricting the interstate movement of goods and people." S. 636, 103d Cong. §§ 8-10 (1993) (as engrossed).

the Commerce Clause[3] or Section Five of the Fourteenth Amendment.[4] Second, he argues that the Act is "invidiously discriminatory" because it protects certain familial relationships and fails to protect others. Third, he contends that the Act is constitutionally overbroad. Finally, he challenges the Act on vagueness grounds.

Five other circuits have addressed the constitutionality of the Act, each finding it to be a legitimate exercise of Congress's authority under the Commerce Clause. *Terry v. Reno*, 101 F.3d 1412 (D.C. Cir. 1996), *cert. denied*, 117 S.Ct. 2431 (1997); *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir.), *cert. denied*, 117 S.Ct. 613 (1996); *United States v. Wilson*, 73 F.3d 675 (7th Cir.

---

[3] "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., art. I, § 8, cl. 3.

[4]

"Section 1. All Persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

. . . .

Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, §§ 1, 5.

1995), *cert. denied*, 117 S.Ct. 47 (1996); *Cheffer v. Reno*, 55 F.3d 1517 (11th Cir. 1995); *American Life League, Inc. v. Reno*, 47 F.3d 642 (4th Cir.), *cert. denied*, 116 S.Ct. 55 (1995). The constitutionality of the Act is a question of first impression in this Circuit.[5] Although we agree with their ultimate holdings, we nevertheless set forth our reasoning, which differs in some respects from that of our sister circuits.

A. *Congress's Commerce Clause Authority*

Relying on *United States v. Lopez*, 115 S.Ct. 1624 (1995), Bird argues that section 248(a)(1) criminalizes private, noneconomic conduct that is neither commercial in nature nor "'an essential part of a larger regulation of economic activity.'" Accordingly, because the Act lacks a jurisdictional element that would ensure that each instance of proscribed activity had an effect on interstate commerce, Bird contends that the Act "'neither regulates a commercial activity nor contains a requirement that the [prohibited activity] be connected to interstate activity.'" Bird further argues that the congressional findings set forth in the Act's legislative history are not relevant to our inquiry because Congress cannot use findings that a noncommercial activity "affected interstate commerce" to support a statute that regulates intrastate conduct. Finally, Bird attacks the "regulatory means"

---

[5]     *Cook v. Reno*, 74 F.3d 97 (5th Cir. 1996), involved an appeal from a dismissal of a request for a preliminary injunction. *Cook* was remanded to the district court for reconsideration of the plaintiffs' standing. This Court did not reach the merits of the constitutional challenge to the Act.

chosen by the Act as not "'reasonably adapted to the end permitted by the Constitution.'" In this regard, Bird contends that the statutory definitions of "facility" and "reproductive health services" sweep too broadly and exceed the reach of Congress's Commerce Clause authority.

The United States defends the Act as a proper exercise of Congress's authority under the Commerce Clause. First, also relying on *Lopez*, 115 S.Ct. at 1629-30, the United States argues that the Act is "a proper exercise of Congress' power to 'protect . . . persons or things in interstate commerce.'" Second, the government contends that the Act may be "sustained as an exercise of Congress' power to regulate 'activities that substantially affect interstate activity.'" The government emphasizes the congressional findings that the proscribed activity "threatens in the aggregate to eliminate abortion services from the national commerce." The government also maintains that no jurisdictional element is required provided a criminal statute addresses a "class of activity" that, in the aggregate, substantially affects interstate commerce. Finally, the government argues that the regulatory scheme adopted by the Act is reasonably adapted to a permissible end.

The Supreme Court's opinion in *United States v. Lopez*, 115 S.Ct. 1624, guides our inquiry. In *Lopez*, the Court set forth the three areas of permissible congressional regulation pursuant to the Commerce Clause. "First, Congress may regulate the use of channels of interstate commerce." *Id.* at 1629 (citing *United States v.*

9

*Darby*, 61 S.Ct. 451, 457 (1941); *Heart of Atlanta Motel, Inc. v. United States*, 85 S.Ct. 348, 357 (1964)). "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* (citing *Shreveport Rate Cases*, 34 S.Ct. 833 (1914); *Southern Ry. Co. v. United States*, 32 S.Ct. 2 (1911); *Perez v. United States*, 91 S.Ct. 1357, 1359 (1971)). "Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce." *Id.* (citing *NLRB v. Jones & Laughlin Steel Corp.*, 57 S.Ct. 615, 624 (1937); *Maryland v. Wirtz*, 88 S.Ct. 2017, 2024 n.27 (1968)). *Lopez* did not set forth the precise standard by which the federal judiciary shall examine Congress's legislative determination that a particular statute has a nexus with interstate commerce under the third category; rather, the Court emphasized that whether Congress had a rational basis for determining that a regulated activity "sufficiently affected interstate commerce" was "'ultimately a judicial rather than a legislative question.'" *Id.* at 1629 & n.2 (quoting *Heart of Atlanta Motel*, 85 S.Ct. at 366 (Black, J., concurring); *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 101 S.Ct. 2352, 2391 (1981) (Rehnquist, J., concurring) ("[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.")).

1.  *Channels of Interstate Commerce*

The first *Lopez* category of permissible interstate regulation, involving regulation of the channels of interstate commerce, is plainly not applicable to the Act.  This category, as described in *Perez*, 91 S.Ct. at 1359, reaches the "misuse" of the channels of interstate commerce.  Oft-cited examples include the transportation or shipment of:  stolen goods, 18 U.S.C. § 2314, *et seq.;* kidnaped persons, 18 U.S.C. § 1201, *et seq.;* prostitutes, 18 U.S.C. § 2421; and drugs, 21 U.S.C. § 841(a); *see also United States v. Robertson*, 115 S.Ct. 1732, 1733 (1995) (affirming federal RICO conviction because gold mine was "engaged in commerce"); *United States v. Darby*, 61 S.Ct. 451 (1941) (upholding the authority of Congress to prohibit the interstate shipment of goods produced by workers whose wages violated the Fair Labor Standards Act); *The Lottery Case*, 23 S.Ct. 321 (1903) (affirming conviction for interstate transportation of foreign lottery tickets under the Federal Lottery Act of 1895).  Section 248(a) "is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce."  *Lopez*, 115 S.Ct. at 1630.[6]

---

[6]     There is no congressional finding that federal regulation of interstate violence or the like against abortion clinics, providers, or patients can be effectively accomplished only if intrastate conduct of the same kind is also federally regulated; nor, so far as we can asertain, was there any evidence to that effect before Congress; and, we are not aware of anything which would support such a conclusion.  *Cf. Lopez*, 2 F.3d at 1351, 1367 n.51 (noting that federal regulation of intrastate drug trafficking had been sustained on the basis of congressional findings that the fungible and

2. *Persons or Things in Interstate Commerce*

The government argues that the Act falls within the second category of permissible interstate regulation, specifically the protection of persons or things in interstate commerce. The government argues that Congress determined, through legislative inquiry, that (1) doctors travel interstate to provide abortion services, (2) patients travel interstate to receive abortion services, and (3) clinics use medical supplies and equipment that have traveled interstate.

We do not find the Act to be a valid exercise of Congress's Commerce Clause authority under the second *Lopez* category. Although unquestionably many—perhaps most—abortion clinics employ out-of-state doctors, serve out-of-state patients, and utilize medical supplies and equipment that have traveled interstate, there is no allegation or showing that, in the present case, America's Women Clinic ever employed physicians, treated patients, or used supplies that so qualified. Congressional regulation or protection of persons or things that move in interstate commerce must ensure that, in fact, a particular "threat"—whether posed by an interstate or intrastate activity—actually threatens persons or things with a plain and clear nexus to interstate commerce. Of course, neither medical doctors nor their patients are by their nature involved in interstate commerce. Nor, for that matter, are medical supplies inherently interstate commodities. In the absence of such a plain

untraceable characteristics of narcotis rendered such regulation necessary to the effective regulation of interstate trafficking).

12

and clear nexus, a statute must employ some mechanism to ensure the federal regulation in fact regulates persons or things in interstate commerce. Traditionally, this has been achieved by a jurisdictional element or a statutory presumption. In this regard, the Court in *Lopez*, 115 S.Ct. at 1629, cited federal statutes criminalizing the destruction of aircraft employed in interstate commerce, 18 U.S.C. § 32(a)(1) (criminalizing the destruction of any aircraft "used, operated, or employed in interstate, overseas, or foreign air commerce"), and theft from interstate commerce, 18 U.S.C. § 659 (criminalizing the theft of "any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment").

Congress did not set forth a jurisdictional element in section 248(a)(1). Even if there had been such a jurisdictional element, or even if we were able to read the language of the Act to imply such a requirement, *United States v. Bass*, 92 S.Ct. 515, 522-23 (1971) (requiring the government to demonstrate "the requisite nexus with interstate commerce" for each element of a federal firearm statute ambiguously containing the phrase "in commerce or affecting commerce"), there was absolutely no allegation nor any evidence produced at trial that America's Women Clinic in Houston employed out-of-state personnel, utilized out-of-state medical supplies, or treated out-of-state patients. To the contrary, Dr. Herring, the only witness, testified that he resided in Dallas, Texas; he was never questioned concerning the supplies or equipment used by the clinic, nor was he asked whether the clinic treated

13

patients from outside of the Houston area, let alone from outside of Texas generally. No documentary evidence addressing the interstate nature of the clinic's business was produced by the government at trial. Without evidence that America's Women Clinic used out-of-state staff or supplies, or that it provided abortion services to out-of-state patients, it is difficult to see how Bird's actions had any affect on interstate commerce in medical supplies, medical personnel, or the provision of medical services to out-of-state patients.

Congress's finding that "many of the patients who seek services from [abortion providers] engage in interstate commerce by traveling from one state to obtain [the abortion services] in another," S. Rep. No. 103-117, at 31; H. Conf. Rep. No. 103-488, at 7, and that physicians and other related medical personnel often travel across state lines to provide abortion services, is not sufficient to support section 248(a)(1) under this second *Lopez* category. That "many," "substantial numbers," or "a majority" of patients and doctors travel interstate to obtain or to provide abortion services does not establish that this particular clinic was ever so served or attended. Nor can the government's citation of cases involving specific, individualized findings relating to *other* clinics in *unrelated* litigation involving a *different* statute serve as a proxy for the individualized inquiry heretofore required for each violation under this second *Lopez* category. *See, e.g.*, *Bray v. Alexandria Women's Health Clinic*, 113 S.Ct. 753, 782, 792 (1993) (Stevens, J., dissenting) (stating that between twenty and

14

thirty percent of patients at a targeted Virginia abortion clinic were from outside Virginia and a majority at one of the Maryland clinics were from outside Maryland); *New York State N.O.W. v. Terry*, 886 F.2d 1339, 1360 (2d Cir. 1989) ("women referred by out-of-state clinics often travel to New York City seeking its superior medical services"), *cert. denied*, 110 S.Ct. 2206 (1990); *Pro-Choice Network v. Project Rescue*, 799 F. Supp. 1417, 1430 (W.D.N.Y. 1992) ("Plaintiffs' health care facilities render services to patients from other states, especially Pennsylvania[,] Ohio, and Canada"); *Lucero v. Operation Rescue*, 772 F. Supp. 1193, 1195 (N.D. Ala. 1991) (finding 1.5% of patients resided outside of Alabama).[7]

3. *Intrastate Activity that "Substantially Affects" Interstate Activity*

That the Act fails to qualify under the first two *Lopez* categories of permissible Commerce Clause regulation is not surprising in light of what appears to be Congress's purpose to reach the prohibited activity at as many abortion clinics as possible. Indeed, the government concedes as much, emphasizing that Congress has the authority to regulate intrastate activity that, in the aggregate, has a substantial effect on interstate commerce.

As a federal criminal statute regulating intrastate,

---

[7] There is no congressional finding, nor (so far as we can ascertain) any evidence before Congress, that in order to effectively protect from violence clinics, providers, or patients which were in interstate commerce it was necessary to also extend such protection to clinics, providers, and patients having no connection to interstate commerce, and we are not aware of anything which would support such a conclusion.

*noncommercial* conduct, section 248(a)(1) must be justified, if at all, as "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 115 S.Ct. at 1631. From the outset, we note, and reject, both the government's and Bird's view of permissible congressional regulation in this *Lopez* category.

Bird insists that *Lopez* requires a statute regulating intrastate activity pursuant to the Commerce Clause to contain a jurisdictional element. Furthermore, Bird maintains that the intrastate activity that may be regulated must, at a minimum, be *commercial*. We do not read *Lopez* so broadly. First, though a jurisdictional element may help to ensure that the exercise of Congress's Commerce Clause authority extends only to those activities that substantially affect interstate commerce, it is only one method, and not *always* a necessary one, by which Congress may achieve that end. *See, e.g.*, *Terry*, 101 F.3d at 1418 ("*Lopez*'s fundamental proposition is that Congress must ensure that its Commerce Clause power to regulate noncommercial activities extends to only those activities that substantially affect interstate commerce. Congress may do so either through its own legislative findings or by including a jurisdictional element in the statute; it need not do both."); *Wilson*, 73 F.3d at 685 ("In discussing the lack of a jurisdictional element in *Lopez*, the Court simply did not state or imply that all criminal statutes must have such an element, or that all statutes with such an element would be

16

constitutional, or that any statute without such an element is per se unconstitutional.").[8]   Second, the Court in *Lopez* did not overrule—indeed, it expressly reaffirmed—the proposition set forth in *Wickard v. Filburn* concerning congressional regulation of intrastate, noncommercial activity:

> "'[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as "direct" or "indirect."'" *Lopez*, 115 S.Ct. at 1628 (quoting *Wickard*, 63 S.Ct. 82, 87 (1942)).

The Supreme Court reiterated that intrastate, noncommercial activities can, in certain circumstances, substantially affect interstate commerce when considered in the aggregate.   After *Wickard*—and its reaffirmance in *Lopez*—there can be no question that Congress is able to regulate noncommercial, intrastate activity that substantially affects interstate commerce,[9] an

---

[8]     In any event, jurisdictional elements do not necessarily preclude "as-applied" Commerce Clause challenges. *See, e.g.*, *United States v. Collins*, 40 F.3d 95, 99-101 (5th Cir. 1994) (reversing Hobbs Act conviction because of the "absence of evidence showing some direct or substantial indirect effect on interstate commerce").

[9]     *See also Russell v. United States*, 105 S.Ct. 2455 (1985) (upholding the federal arson statute, 18 U.S.C. § 844(i), which criminalizes the destruction or attempted destruction by arson of "property used in . . . any activity affecting interstate or foreign commerce"); *United States v. Corona*, 108 F.3d 565 (5th Cir. 1997) (affirming a conviction under 18 U.S.C. § 844(i) for the destruction of commercial property, but questioning whether an unlimited "effects test" would permit the "speculative" aggregation of negligible effects on interstate commerce to support a conviction for the burning of a private residence); *Stirone v. United*

17

admittedly broad power not without danger to the federalism that is the most fundamental postulate of our constitutional order.[10]  The question remains in any given case, however, whether Congress's exercise of power in this manner is properly limited.  It is the government's view of this limiting principle that we find flawed.

Under the government's view, Congress need only identify a broad "class of activities" and determine that, viewed in the aggregate, the class "substantially affects" interstate commerce. Of course, the only "limits" provided by such a construction as thus stated are the depths of judicial imagination.  The government made a similar, unrestricted argument to justify the Gun Free School Zones Act in *Lopez.*  This Court characterized the government's version of the "class of activities" argument as

---

*States*, 80 S.Ct. 270 (1960) (upholding the Hobbs Act, 18 U.S.C. § 1951, which criminalizes certain noncommercial activities that "affect[] commerce or the movement of any article or commodity in commerce"); *United States v. Coleman*, 78 F.3d 154, 158-60 (5th Cir.) (upholding the federal car-jacking statute, 18 U.S.C. § 2119, which criminalizes car jacking "a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce"), *cert. denied*, 117 S.Ct. 230 (1996). *Cf. Katzenbach v. McClung*, 85 S.Ct. 377 (1964), and *Heart of Atlanta Motel, Inc. v. United States*, 85 S.Ct. 348 (1964) (upholding anti-discrimination in service provisions of Title II of the Civil Rights Act of 1964 as applied to restaurants and hotels engaged in interstate commerce).

[10]     The Tenth Amendment contains no substantive restriction on the legitimate exercise of Congress's Commerce Clause authority; that is, the boundaries of the Commerce Clause power are not delineated by the Tenth Amendment. But, the Tenth Amendment plainly *does* confirm that the commerce power is *not* limitless, that hence such boundaries *do* exist, and that they *must not* be transgressed.

lacking a limiting feature such as the existence of a national market:

> "The government seeks to rely on the rule that '[w]here the *class of activities* is regulated and that *class* is within the reach of the federal power, the courts have no power "to excise as trivial, individual instances" of the class.' This theory has generally been applied to the regulation of a class of activities the individual instances of which have an interactive effect, usually because of market or competitive forces, on each other and on interstate commerce. A given local transaction in credit, or use of wheat, because of national market forces, has an effect on the cost of credit or price of wheat nationwide. Some such limiting principle must apply to the 'class of activities' rule, else the reach of the Commerce Clause would be unlimited, for virtually all legislation is 'class based' in some sense of the term." *Lopez*, 2 F.3d at 1367 (quoting *Perez*, 91 S.Ct. at 1361; *Wirtz*, 88 S.Ct. at 2022).

We believe that a requirement for such a limiting principle in the absence of a jurisdictional element, although not expressly adopted by the Supreme Court, is the only legitimate reading of the *Wickard-Perez* line of cases. Unless there is something that relevantly ties the separate incidents and their effects on interstate commerce together, aside from the desire to justify congressional regulation, the government's "class of activities" interpretation would transform Justice Breyer's *Lopez* dissent into the constitutional rule. *See Lopez*, 115 S.Ct. at 1659-62 (Breyer, J., dissenting) (arguing that guns in schools undermine the quality of education which, in turn, leads to "lagging worker productivity" and, eventually, the erosion of "our [Nation's] economic 'standing in the international marketplace'"); *id.* at 1632 (criticizing the government's "costs of crime" and "national productivity"

19

arguments).[11]  *Wickard* itself offered, as a limiting principle, the national wheat market.   *Perez* cited the national market for commercial credit.   The "fungible and untraceable" characteristic of narcotics—which Congress found made federal regulation of *intra*state trafficking an operationally necessary prerequisite to effective regulation of the *inter*state activity—was itself a tying feature (albeit one which was more relevant to bring intrastate activity within the reach of *Lopez*'s first category).  *See Lopez*, 2 F.3d at 1351, 1367 n.51 (citing *United States v. Lopez*, 459 F.2d 949, 951-53 (5th Cir.), *cert. denied sub nom. Llerena v. United States*, 93 S.Ct. 130 (1972)).

In other words, although activities proscribed by an act of Congress may constitute, generically, a "class of activities," and, when viewed in the aggregate, these activities may "substantially affect" interstate commerce in some broad and general sense, these two features, alone, are not sufficient to justify congressional legislation pursuant to the Commerce Clause.  What was missing in *Lopez*, and what is needed to justify congressional action under the "substantial effects" category, are "judicially enforceable outer

---

[11]     These considerations similarly inform us that, in determining whether the regulated intrastate activity substantially affects interstate commerce, "substantial" must be understood to have reference not only to a quantitative measure but also to qualitative ones; effects which are too indirect, remote, or attenuated—or are seen only by piling "inference upon inference"—are not substantial.   Our use of "substantially" hence embraces both quantitative and qualitative measures.

limits." *Lopez*, 115 S.Ct. at 1633.[12]

Accordingly, our inquiry must determine not simply whether section 248(a)(1) proscribes intrastate activity that has (or might have) a substantial affect on interstate commerce, but rather whether there is a national commercial market in abortion-related services such that the regulated conduct——considered in light of the size and scope of the benchmark market—substantially affects interstate commerce. In other words, Congress must have divined the existence of a national commercial market in abortion-related services in which the closing down or obstruction of any clinic (or clinics) in one state (even if only serving local patients with local doctors) substantially affects the ability of clinics in other states to provide abortion-related services. To this end we must examine the congressional findings, the committee reports, and

---

[12] While certain language in *United States v. Robinson*, 119 F.3d 1205 (5th Cir. 1997), read in isolation, might be understood to embrace a somewhat far-reaching "class of activities" analysis, the opinion must be read in the context of what was before the panel there, namely a prosecution under the Hobbs Act, a statute specifically providing for an interstate commerce nexus, for robberies of businesses directly engaged in interstate commerce (in addition to dealing in merchandise from out of state, "[t]he stores provided check-cashing services . . . the stores cashed out-of-state checks, payroll checks, and government benefit checks") with a direct impact on the interstate commerce of the locations robbed ("one store was forced to close permanently for lack of capital, and the others were unable to cash checks for a finite period of time"). *Id.* at 1208. Here, by contrast, the statute requires no nexus whatever to interstate commerce, and the evidence does not establish that the victim clinic or doctor was (then or ever) engaged in interstate commerce (i.e., serving interstate patients or utilizing out-of-state providers or the like).

the relevant testimony.

We are persuaded that section 248(a)(1) is a legitimate regulation of intrastate activity having a substantial affect on interstate commerce. First, Congress made findings, supported by the testimony presented to the House and Senate committees charged with considering the Act, that there was an interstate commercial market for abortion services. Second, Congress found that the activity prohibited by the Act constituted a nationwide problem, regularly causing the interruption of abortion services at the clinics where the prohibited activity occurred.[13] Third, Congress

---

[13] We do not suggest that simply because a type of antisocial conduct (which any state could validly proscribe) can fairly be described as a "national" problem in the sense that many (or even all) states experience more instances of it than are desirable or desired, that this of itself suffices to bring such conduct within the scope of Congress's Commerce Clause power. Plainly it does not. Ever since a time well before the Constitutional Convention, there have been every year in each of the several states more murders than desirable or desired, but it is nevertheless plain that the Commerce Clause does not authorize Congress to enact legislation punishing any and all murders throughout the nation. As Chief Justice Marshall wrote for a unanimous Court in *Cohens v. Virginia*, 19 U.S. 264, 5 L.Ed. 257 (1821), "Congress has . . . no general right to punish murder committed within any of the states," *id*. at 426, and "[i]t is clear, that Congress cannot punish felonies generally." *Id*. at 428. Here, it is also true that the proscribed offenses all share a relatively narrow common goal or motivation and are all directed at a relatively narrow common set of victims, and further that many of the proscribed offenses involve common perpetrators traveling in interstate commerce and victims engaged in interstate commerce. As the proscribed conduct is present nationally, these factors may have some tendency to support the statute, but are not collectively of themselves alone sufficient to bring it within the Commerce Clause where the statute has no jurisdictional nexus and neither the allegations nor the evidence show that the defendant traveled in

22

found that the interruption of abortion services due to the activities prohibited by the Act caused (or was likely to cause) women to travel from the states where abortion services were interrupted to clinics, often out of state, that were able to provide unobstructed abortion services. Finally, it is a fair inference, supported by congressional testimony, that the proportionate increase in demand at unobstructed clinics brought about by those women forced to seek abortion services in the national commercial market because of intrastate activity obstructing local abortion clinics both increased (or was likely to increase) the cost of abortion services and reduced (or was likely to reduce) the availability of abortion services at the unobstructed clinics. Accordingly, in light of the national commercial market in abortion-related services recognized by Congress, we hold that Congress was justified in concluding that the regulation of intrastate activity—the activity prohibited by the Act—was necessary to ensure the availability (both in terms of access and price) of abortion services in the national commercial market. Consistent with *Lopez*'s admonition, we note that the presence of a national commercial market in abortion-related services, together with the effects on such market of the proscribed conduct, serves as a limiting principle circumscribing

---

interstate commerce (or acted in concert with those who did) or that either the clinic or provider was engaged in interstate commerce (and there being no showing or congressional finding that regulation of intrastate perpetrators or protection of intrastate victims was necessary to effectively either regulate interstate perpetrators or protect interstate victims).

23

Congress's regulation of intrastate activity under the Act.

In reaching our determination that the Act satisfies the "substantially affects" category, we note that the finding set forth in the Conference Committee Report, stating that the activity proscribed by the Act "burdens interstate commerce by forcing patients to travel from states where their access to reproductive health services is obstructed to other states" is a conclusion derived from months of legislative hearings, research, and debate. As such, it is entitled to deference and should be interpreted, insofar as it is consistent with the information before the Congress at the time of enactment, to support a constitutional reading of the Act.[14]  *Cf. Rust v. Sullivan*, 111 S.Ct. 1759, 1771 (1991) ("'The elementary rule is that every reasonable construction must be resorted to, in order to *save a statute* from unconstitutionality.'") (quoting *Hooper v. California*, 15 S.Ct. 207, 211 (1895)).

a.  *National Market for Abortion-Related Services*

Congress found that doctors travel across state lines to

_____

[14]     Use of legislative history in this manner is entirely consistent with our responsibility to gauge the regulated activity's effect on interstate commerce. *See Lopez*, 115 S.Ct. at 1631 ("[A]s part of our independent evaluation of constitutionality under the Commerce Clause we of course consider the legislative findings, and indeed even the congressional committee findings, regarding the effect on interstate commerce . . . ."); *Presseault v. ICC*, 110 S.Ct. 914, 924-25 (1990) (discussing the House and Senate reports accompanying the National Trails System Act); *Bass*, 92 S.Ct. at 520-21 (examining House and Senate floor statements to discern link to interstate commerce); *Coleman*, 78 F.3d at 158-59 (quoting House Report and House and Senate floor statements).

24

provide abortion services and that patients also travel interstate to obtain such services. S. Rep. No. 103-117, at 31 (1993) ("[M]any of the patients who seek services from these facilities engage in interstate commerce by traveling from one state to obtain services in another."); H. Rep. No. 103-306, at 8 (1993) ("Many of the counties that have providers are urban centers. A rural provider is often the only provider in a large geographical area. . . . The facts are that only 17 percent of U.S. counties have an abortion provider and that clinic owners face a shortage of doctors willing to perform abortions."), *reprinted in* 1994 U.S.C.C.A.N. 699, 705. Indeed, it is the very shortage of abortion-related services that appears to have created the national market for these services. *See* S. Rep. at 17 & n.29 ("The availability of abortion services is already very limited in many parts of the United States. Nationwide, 83% of counties have no abortion provider. In South Dakota, the only physician who performs abortions commutes from Minnesota.").

The House and Senate reports accurately reflect the testimony presented to the respective committees. *See Abortion Clinic Violence: Hearings Before the Subcomm. on Crime and Criminal Justice of the Comm. on the Judiciary*, 103d Cong., at 3 (1993) [hereinafter *House Hearings*] (letter of Atty. Gen Reno) (stating that "patients and staff frequently travel interstate" to receive or to administer abortion-related services); *The Freedom of Access to Clinic Entrances Act of 1993: Hearing Before the Comm. on Labor and Human Resources*, 103d Cong., at 11, 16-17 (1993) [hereinafter

*Senate Hearings*] (statement of Atty. Gen. Reno) (stating that abortion clinics are engaged in interstate commerce and that clinics serve significant numbers of out-of-state patients); *id.* at 59, 64-65 (statement of Willa Craig, Executive Director, Blue Mountain Clinic, Missoula, MT) ("A large number of our abortion and our prenatal patients travel an average of 120 miles to their appointments at our clinic due to a lack of services in their own areas. These areas include Idaho, eastern Washington, Wyoming and Canada."); *see also* 139 Cong. Rec. S15, 658 (daily ed. Nov. 16, 1993) (statement of Sen. Kennedy) (noting the nationwide shortage of abortion-related services).

b. *Activity Proscribed by the Act Threatens the Availability of Abortion-Related Services*

Congress found that the activity proscribed by the Act constituted a national problem, regularly causing the interruption of abortion-related services at the clinics where prohibited activity occurred. The Senate Report states that clinic blockades and violent protests had "a significant adverse impact not only on abortion patients and providers, but also on the delivery of a wide range of health care services. This conduct has forced clinics to close, caused serious and harmful delays in the provision of medical services, and increased health risks to patients. It has also taken a severe toll on providers, intimidated some into ceasing to offer abortion services, and contributed to an already acute shortage of qualified abortion providers." S. Rep. No. 103-117, at 14. The Senate Report observed the link between the activity prohibited by the Act and the concomitant shortage in

abortion-related services. *Id.* at 17 ("Some providers have succumbed to the intimidation and threats. At least three physicians in Dallas stopped performing abortions in 1992 as a result of pressure by an anti-abortion group. In early 1993, after receiving death threats, two doctors stopped working at an abortion clinic in Melbourne, FL. And since Dr. Gunn was shot in March 1993, at least eight more doctors have stopped offering abortion services."); *id.* at 80 (statement of Randall Terry, Director, Operation Rescue) (stating that he personally facilitated the withdrawal of half the abortion providers in a community). The House Report also observed that the reduced availability of abortion-related services was "at least partially attributable to the violence and intimidation described in this report. Doctors understandably are leaving the field, and new graduate[s] have little desire to enter the field even as part of a wider obstetrics/gynecology practice." H. Rep. No. 103-306, at 8. Congress noted the severity and frequency of abortion clinic violence. *Id*. (noting that, from 1984 through 1992, there had been "28 bombings, 62 arsons, 48 attempted bombings and arsons, 266 bomb threats, and 394 incidents of vandalism"); S. Rep. No. 103-117, at 3 & n.1 (noting that, from 1977 through 1993, there had been "36 bombings, 81 arsons, 131 death threats, 84 assaults, two kidnappings, 327 clinic invasions, and one murder"). Testimony before Congress made clear that the goal of the activity proscribed by the Act was to reduce or eliminate the national market for abortion-related services and that such activity had already

27

achieved partial success. *See, e.g.*, *House Hearings*, at 2 (statement of Rep. Schuman) (observing that "[t]he stated goal of the tactics is to drive doctors and clinics out of the business of providing abortions and the tactics appear to be working" and noting the diminishing numbers of physicians willing to provide abortion-related services); *Senate Hearings*, at 167-68 (statement of Freedom of Choice Action League) (detailing resignation of a Wichita, Kansas, physician from an abortion clinic after she received repeated threats). Floor debates also focused on the interruption of abortion-related services brought about by the activity proscribed by the Act. *See, e.g.*, 139 Cong. Rec. S15,672 (daily ed. Nov. 16, 1993) (statement of Sen. Mikulski) (noting that abortion clinic violence has "destroyed clinic facilities—leaving women without access to health care facilities"); 139 Cong. Rec. H10,089 (daily ed. Nov. 18, 1993) (statement of Rep. Pelosi) ("over 50 percent of clinics across the country offering reproductive health services have undergone extreme violence"); *id.* at H10,090 (statement of Rep. Engel) ("The work of many clinics—which often includes low-cost prenatal care, birth control, infertility, and adoption as well as abortion services—has been disrupted regularly by blockades, chemical attacks, and invasions."); *id.* at H10,091 (statement of Rep. Stokes) ("[Activity proscribed by the Act has] damaged clinic facilities or driven away clinic staff, forcing these facilities to reduce their patient load and the wide range of services they provide. Other clinics have had to cease operations altogether after their facilities were destroyed by fire or

28

bombings, leaving thousands of women without adequate health care services."); 139 Cong. Rec. H1501 (daily ed. Mar. 17, 1994) (statement of Rep. Kennelly) (noting the national scope of the abortion clinic violence).

c. *The National Shortage of Abortion-Related Services Forces Travel to Out-of-State Providers*

Congress found that the interruption of abortion-related services due to the activities proscribed by the Act caused (or was likely to cause) women to travel from those states where abortion-related services were not reasonably available to clinics in those states where abortion-related services were reasonably available. The Senate Report states:

> "[B]lockades that make access to a health care facility difficult or hazardous can have traumatic effects on patients by delaying their access to urgent medical care and by exacerbating their medical conditions. . . . For patients seeking abortion services, the adverse effects of a clinic blockade can be particularly serious. Dr. Pablo Rodriguez described the effects on patient health:
>> 'Our patients are the ones who suffer. Women who do make it in have a heightened level of anxiety and a greater risk of complications. The delay caused by the invasions has forced some patients to seek care elsewhere due to the fact that their gestational age has gone beyond the first trimester.'"
> S. Rep. No. 103-117, at 15 (quoting testimony of Dr. Pablo Rodriguez).

The House Report reaches a similar conclusion. *See* H. Rep. No. 103-306, at 10. ("In addition, patients often cross state lines to obtain services . . . .") (citing testimony of Silvia Doe).

Testimony before Congress made clear that activity proscribed by the Act delayed (and threatened to deny permanently) access to abortion-related services to women who, due to the existing

29

shortage of such services, had traveled (or would be required to travel) interstate to obtain them. Silvia Doe testified about her decision to seek a late-term abortion after learning of a fetal malformation. She further testified that only three clinics in the country offer such a service. She was forced, by the shortage of providers, to travel from Virginia to Kansas. In Wichita, Kansas, she was delayed from obtaining her abortion due to a clinic blockade at the Wichita clinic. *Clinic Blockades: Hearing Before the Subcomm. on Crime and Criminal Justice of the Comm. on the Judiciary*, 102d Cong., at 9-17 (statement of Silvia Doe).

The congressional testimony and the activity described in the committee reports provide sufficient evidence for the Congress to have concluded that entirely intrastate activity—here, the activity proscribed by the Act—had, at the very least, the *potential* to cause women who had been prevented from obtaining abortion-related services in their home states to travel to unobstructed providers in other states.

d.   *Intrastate Activity Proscribed by the Act Affects the Availability of Abortion-Related Services in the National Market*

We are persuaded that it is a fair inference that the activity proscribed by the Act—which has (or threatens to have) the effect of precluding access to abortion-related services in the area served by the targeted clinic—can have a substantial affect on the availability of abortion-related services in the national market. Such a conclusion is rational and supported by testimony presented to the committees charged with reviewing the bills that eventually became the Act.

30

The House Subcommittee on Crime and Criminal Justice heard testimony that, because of the continued threats of violence and disruptive activities, abortion clinics have been forced to implement heightened security measures to ensure access. *House Hearings*, at 25 (statement of Susan Hill, President, Nat'l Women's Health Org.) (noting that "[o]bviously, that drives up the costs of providing the service"). The Senate Committee on Labor and Human Resources considered a report printed in the *American Journal of Obstetrics and Gynecology* which noted that abortion clinic violence increases the costs of abortion services at those clinics that remain open. The report stated that abortion patients have been forced, due to clinic violence, to seek other providers or postpone care. *Senate Hearings*, at 54. Additional testimony before the Senate Committee set forth the Commerce Clause rationale for the Act's regulation of intrastate activities to ensure the availability of abortion-related services in the national market:

> "The pattern of interstate effects produced by the pressured movement of women from State to State under a variegated patchwork of local enforcement against blockades, violence and physical intimidation at abortion clinics is undoubtedly sufficient to warrant Congress's invocation of its commerce power. Similarly, the shift of demand for abortion services from those areas where clinic access is obstructed to those areas where it is not represents the sort of interstate economic effect that is beyond the effective control of any one State and is accordingly a proper subject for congressional regulation under the Commerce Clause." *Id.* at 97 (statement of Professor Tribe) (citing *Summit Health, Ltd. v. Pinhas*, 111 S.Ct. 1847, 1846-47 (1991)).

This described shift in demand from obstructed clinics to unobstructed clinics—given the national scarcity of abortion-related services—supports the legitimacy of Congress's enactment

31

of section 248(a).   The patent congressional concern that the activity proscribed by the Act, although intrastate, could have a deleterious impact on the availability of abortion-related services in the national market, makes clear that "Congress was addressing an interstate problem rather than a multistate, intrastate problem."  *Wilson*, 73 F.3d at 683.

Accordingly, in light of the evident congressional purpose to ensure the availability of abortion-related services in the national commercial market,[15] we hold that the enactment of section

---

[15]    We recognize, of course, that "[t]he motive and purpose of a regulation of interstate commerce are matters for the legislative judgment upon the exercise of which the Constitution places no restriction and over which the courts are given no control." *Darby*, 61 S.Ct. at 457.  This is not to say, however, that the motive or purpose of any congressional regulation passed under the Commerce Clause is "irrelevant."  *United States v. Soderna*, 82 F.3d 1370, 1374 (7th Cir. 1996).  Certainly when Congress is regulating *inter*state commercial activity, its reason for doing so is immaterial.  But where, as here, Congress is regulating purely *intra*state, noncommercial activity because of its *substantial affect* on interstate commerce, the purpose must in fact be to regulate interstate commerce.  "*Let the end* be legitimate, let it *be within the scope of the constitution*, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the *letter and spirit* of the constitution, are constitutional."  *M'Culluch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819) (emphasis added).  *See also id*. at 423 ("should Congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not entrusted to the government," Supreme Court would be bound to hold law invalid).  Surely, it would be a perversion of congressional authority to uphold as constitutional a federal statute that purported to be an exercise of Commerce Clause power but was for the sole purpose of reaching intrastate activity without regard to whether or how that activity would actually affect interstate commerce.  The regulation of intrastate commerce *per se*, and for its own sake, and not as a means of regulating or

32

248(a), as applied to the facts of the present case, was a constitutional exercise of Congress's power under the Commerce Clause. Because we conclude that Congress possessed the requisite authority under the Commerce Clause, we pretermit the substantially more questionable assertion of congressional authority to criminalize purely private conduct (not directed at state property or facilities) under Section Five of the Fourteenth Amendment. *See The Civil Rights Cases*, 3 S.Ct. 18 (1883). *See also City of Boerne v. Flores*, 117 S.Ct. 2157, 2166 (1997).[16]

B. *Invidious Discrimination against Familial Relationships*

Bird next argues that the Act is unconstitutional because it protects certain familial relationships, but fails to protect others. Section 248(a) states that "a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed

---

affecting interstate commerce, is not an "end . . . within the scope of the constitution." Here, however, we cannot say that Congress has so perverted its Commerce Clause power. The regulation in question is at least colorably directed at ensuring the availability of abortion-related services in the national commercial market.

[16] Nor do we have occasion to determine the propriety of the Act's criminalization of certain activities by private citizens that may interfere with a person's exercise of religious freedom at a place of worship or a person's use of a noncommercial counseling facility—neither of which would seem to fall within the type of economic regulation permitted by *Lopez* as there was no congressional finding or testimony concerning the commercial nature of such activity, any national shortage of counselors or counseling services, or the existence of any national tying feature supporting the exercise of congressional Commerce Clause authority under the "substantial affects" category.

exclusively at that minor." 18 U.S.C. § 248(a). Thus, a father who physically blocks his daughter from having an abortion has not violated the Act, but a brother who restrains his sister has violated the Act. Bird asserts that there is no reasonable basis for exempting certain familial relationships while exempting others.

As Bird is not related to Dr. Herring in any capacity, and the record does not establish that his actions in any manner reflect an attempt to affect the obtainment of abortion-related services by a member of his family, he lacks standing to advance this claim—his concern is simply not implicated by the facts here presented. This Court "'has no jurisdiction to pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies.' . . . [O]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *United States v. Raines*, 80 S.Ct. 519, 522 (1960) (quoting *Liverpool, N.Y. & Phila. S.S. Co. v. Commissioners of Emigration*, 5 S.Ct. 352, 355 (1885)); *see also United States v. Salerno*, 107 S.Ct. 2095, 2100 & n.3 (1987). Accordingly, we express no opinion as to the merits of Bird's challenge in this respect.

C. *Overbreadth*

Bird next argues that the Act is unconstitutional because it

34

is overbroad under the First Amendment.  Bird concedes that the First Amendment does not protect activities that are violent or physically injurious, including threats of force and certain physical obstructions, such as blockades of pedestrian traffic.  Instead, Bird takes issue with the Act's prohibition on physical obstruction, intentional interference with others, attempted interference with others, and intentional injury "in the emotional or psychological sense."  Bird contends that a "large demonstration or picketing activity could well constitute a 'physical obstruction'" under the Act.

We need not tarry long with Bird's overbreadth argument, for the Act proscribes conduct, not speech.  By its terms, it prohibits only specified uses of "force," "threat[s] of force," and "physical obstruction"; none of which are protected by the First Amendment. *Wisconsin v. Mitchell*, 113 S.Ct. 2194, 2199 (1993) (force); *Madsen v. Women's Health Ctr., Inc.*, 114 S.Ct. 2516, 2529 (1994) (threats); *Cameron v. Johnson*, 88 S.Ct. 1335, 1338-39 (1968) (physical obstruction).  In any event, the conduct for which Bird was convicted, and at least virtually all that proscribed by the terms of section 248(a)(1), is not protected by the First Amendment; accordingly, that there could arguably be some rare hypothetical case at the outer margins of section 248(a)(1) where First Amendment concerns might arise does not avail *Bird*. *Broadrick v. Oklahoma*, 93 S.Ct. 2908, 2917-18 (1973); *see also Morse v. Republican Party of Virginia,* 116 S.Ct. 1186, 1211 & n.38 (1996); *United States v. Wallington*, 889 F.2d 573, 576 (5th Cir.

35

1989).  This is particularly so as the Act was narrowly drafted with the intent of not abridging First Amendment protections.[17]

Accordingly we agree with every other circuit court that has addressed the issue and hold that the Act is not unconstitutionally overbroad.  *See Terry*, 101 F.3d at 1421; *Soderna*, 82 F.3d at 1376; *Dinwiddie*, 76 F.3d at 924; *Cheffer*, 55 F.3d at 1520-21; *American Life League*, 47 F.3d at 653.

D.  *Vagueness*

A statute is unconstitutionally vague if it does not give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."  *Grayned v. City of Rockford*, 92 S.Ct. 2294, 2298-99 (1972).  Bird asserts that the Act fails to give fair notice of what is proscribed and fails to provide explicit standards for the enforcement of particular provisions.  Specifically, he claims that the terms "intimidate," "interfere with," "attempts to . . . intimidate or interfere with" and "injures" are too vague to be constitutional.  An abortion protester, he argues, will not be sure whether his actions comply with the Act or subject him to penalties.

The Supreme Court has upheld against a vagueness challenge a statute closely resembling the Act.  *Cameron*, 88 S.Ct. 1335.  The

---

[17]     The Act provides:
"(d) **Rules of Construction**.--Nothing in this section shall be construed--
(1) to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution."  18 U.S.C. § 248(d).

statute at issue in *Cameron* provided that:

> "'It shall be unlawful for any person, singly or in concert with others, to engage in picketing or mass demonstrations in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any public premises . . . .'" *Id.* at 1336 n.1.

The Court found that the statute "clearly and precisely delineate[d] its reach in words of common understanding." *Id.* at 1338. In light of the Act's similarity to the statute at issue in *Cameron*, we hold that the Act's terms are not unconstitutionally vague. *See Terry*, 101 F.3d at 1421; *Dinwiddie*, 76 F.3d at 924. In any event, there is no vagueness or lack of clarity in the application of the terms of section 248(a)(1) to what Bird was convicted of doing, and in at least the vast majority of cases whether or not the terms of section 248(a)(1) apply will be adequately clear; the theoretical possibility that some rare case at the margins of section 248(a)(1) might arise where the applicable of its terms could be unclear does not avail Bird. *Parker v. Levy*, 94 S.Ct. 2547, 2562 (1974); *Umphlet v. Connick*, 815 F.2d 1061, 1066 (5th Cir. 1987); *Ferguson v. Estelle*, 718 F.2d 730, 735 (5th Cir. 1983).

## II.

As a condition of supervised release, the district court ordered Bird to "[s]tay at least 1,000 feet away from abortion clinics, specifically the America's Women Clinic." The district court was permitted to order, as a condition of supervised release, "any other condition it consider[ed] to be appropriate" provided the condition "involve[d] no greater deprivation of liberty than

37

[was] reasonably necessary" to deter criminal conduct and to protect the public. 18 U.S.C. § 3583(d). The district court cited Bird's prior convictions for trespassing at abortion clinics as support for the special condition.

Bird argues that the special condition violates his First Amendment rights because it was not narrowly tailored to serve a significant government interest and because the special condition was duplicative of the "standard conditions of supervision" set forth in the judgment.

This Court reviews a district court's entry of special conditions of supervision for an abuse of discretion. *United States v. Mills*, 959 F.2d 516, 519 (5th Cir. 1992); *United States v. Tonry*, 605 F.2d 144, 148 (5th Cir. 1979). In light of Bird's prior activities involving criminal activity at or near both abortion clinics and at the residence of an abortion provider and his earlier refusal to accept any restrictions on his protest activity, we cannot say that the district court abused its discretion in determining that the 1,000 foot requirement was reasonably necessary to prevent Bird from repeating the activity for which he was convicted. Bird's conviction for violent activity under the Act constitutes a sufficient governmental interest to justify a temporary limitation on Bird's First Amendment rights. *See United States v. Turner*, 44 F.3d 900, 903 (10th Cir.), *cert. denied*, 115 S.Ct. 2250 (1995); *United States v. Cothran*, 855 F.2d 749, 751 (11th Cir. 1988). Bird's contention that the provision of a standard condition that Bird "shall not associate with any

38

persons engaged in criminal activity" invalidates the district court's more specific special condition is without merit. The district court was within its authority conferred by 18 U.S.C. § 3583(d).

III.

Bird finally argues that the district court's judgment is unconstitutional and violative of due process because it states, under "Nature of Offense," that he was found guilty of "Blocking Entrance to an Abortion Clinic" when, in fact, the indictment sets forth his specific conduct as intimidating and interfering with Dr. Herring's provision of abortion services.

Bird's claim is without merit. Bird was indicted for conduct violative of 18 U.S.C. § 248(a)(1) (and the indictment references that section alone). He was found guilty, after a jury trial, of violating 18 U.S.C. § 248(a)(1). The judgment states that Bird was found guilty of violating 18 U.S.C. § 248(a)(1). That the judgment characterizes his offense as "blocking" an entrance to an abortion clinic is, at most, a reference to the name of the statute that he violated—the Freedom of *Access* to Clinic Entrances Act (FACE). That Dr. Herring was able to make it past Bird's bottle-throwing attempt to stop his car from entering the America's Women Clinic does not invalidate the judgment. The district court's judgment is entirely consistent with both the nature of his offense and with due process.

**Conclusion**

For the foregoing reasons, we AFFIRM the judgment of the

39

district court.

                              AFFIRMED

ENDRECORD

DeMOSS, Circuit Judge, concurring in part and dissenting in part:

I concur in subparts I(B), I(C), and I(D) and in parts II and III of the majority opinion. I also concur in section I(A)(1) ("Channels of Interstate Commerce") and section I(A)(2) ("Persons or Things in Interstate Commerce") of the majority opinion, which conclude that the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248 *et seq.* (hereinafter "FACE"), was not validly enacted under either of the first two categories of Commerce Clause analysis set forth by the Supreme Court in ***United States v. Lopez***, 514 U.S. 549 (1995). However, I cannot concur in the analysis and holding in section I(A)(3) ("Interstate Activity that 'Substantially Affects' Interstate Activity") of the majority opinion, which concludes that the enactment of FACE falls within part three of the ***Lopez*** analysis because Congress found a "national commercial market in abortion-related services," and that Congress was justified in determining "that the regulation of intrastate activity—the activity prohibited by the Act—was necessary to ensure the availability (both in terms of access and price) of abortion services in the national commercial market." *Ante* at 22. Because I disagree with the fundamental premises of these holdings, I write now to explain my reasons.

## I.

Rather than applying the clear and explicit criteria which the Supreme Court set forth in ***Lopez***, the majority considers the constitutionality of FACE under the third ***Lopez*** category by constructing an analysis built upon three essential premises:

1.    "After *Wickard*—and its reaffirmance in *Lopez*—there can be no question that Congress is able to regulate noncommercial, intrastate activity that substantially affects interstate commerce, an admittedly broad power not without danger to the federalism that is the most fundamental postulate of our constitutional order."  *Ante* at 17 (footnotes omitted).

2.    "[A] requirement for . . . a limiting principle in the absence of a jurisdictional element, although not expressly adopted by the Supreme Court, is the only legitimate reading of the *Wickard-Perez* line of cases."  *Ante* at 18-19.

3.    "[O]ur inquiry must determine not simply whether § 248(a)(1) proscribes intrastate activity that has (or might have) a substantial effect on interstate commerce, but rather whether there is a national commercial market in abortion-related services such that the regulated conduct—considered in light of the size and scope of the benchmark market—substantially affects interstate commerce."  *Ante* at 20.

I disagree with each of these premises, which create fundamental and logical deficiencies in the majority's analysis.

There is no question that the conduct proscribed by FACE is "intrastate and noncommercial conduct."  Injuring or threatening to injure persons who seek to receive or deliver abortion services is, by its very nature, an intrastate activity; such conduct inherently involves face-to-face and person-to-person contact which must occur

42

in the same place at the same time. Likewise, such conduct does not involve the transfer of money or any other consideration between the perpetrator and the victim, and there is no commercial motive prompting the perpetrator to engage in such conduct.

I think the first premise of the majority opinion as set forth above is inaccurate in two respects. First, I do not read *Lopez* as an affirmance of *Wickard*. Rather, I see *Lopez* as a reinterpretation of *Wickard* which focuses on what the Court now says is the essential ingredient for Congress to be able to regulate intrastate noneconomic conduct which substantially affects interstate commerce. Particularly, the proscribed intrastate, noncommercial activity must be "an essential part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity were regulated." *Lopez*, 514 U.S. at 561. The majority recognizes this essential ingredient in the second paragraph of its discussion of "intrastate activity that substantially affects interstate activity," s*ee ante* at 15, but then blithely ignores the fact that FACE is not a part of any larger regulatory scheme, and moves on to discuss the need for a "limiting principle," as indicated by the majority's second premise above.

The only relevant "limiting principle" is the one dictated by the Supreme Court's *Lopez* decision. The *Lopez* Court adopted a new reading of the *Wickard*-*Perez* line of cases by specifying that, for Congress to be able to regulate intrastate and noncommercial conduct under the Interstate Commerce Clause, such conduct must be

43

"an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* FACE does not meet these criteria. The legislation is not an essential part of a larger regulatory scheme which would be undercut if Congress does not proscribe with criminal sanctions the intrastate and noncommercial conduct which FACE addresses.

Consequently, the majority errs in engaging in an examination of "the congressional findings, the committee reports, and the relevant testimony," *ante* at 20, to determine whether Congress found a national commercial market in abortion-related services, which would serve as the "limiting factor" that would minimize the danger to federalism. There is absolutely nothing in the Supreme Court's *Lopez* decision that speaks to the majority's concept of a "national market" as being a limiting factor. As the majority opinion indicates, this "national market" limiting concept is a leftover argument from our Circuit's panel opinion in *Lopez*. *See United States v. Lopez*, 2 F.3d 1342, 1367 (5th Cir. 1993), *aff'd on other grounds*, 514 U.S. 549 (1995). In my view, to the extent that the "national market" concept appears in our Circuit's *Lopez* opinion, it is dicta. Regardless, when the Supreme Court decided *Lopez*, it provided a new framework for appraising legislation under the Commerce Clause, and it did not include the "national market" consideration in its own analysis, which necessarily supersedes the earlier analysis from this Circuit. *See, e.g., United States v. Pettigrew*, 77 F.3d 1500, 1511 n.1 (5th Cir. 1996) ("While . . . one

44

panel of this Court is generally powerless to overrule the previous decision of another panel absent rehearing by the full Court sitting en banc, an exception to this rule arises when there has been an intervening decision by the United States Supreme Court overriding the earlier decision.").

Furthermore, neither the Fifth Circuit's *Lopez* opinion, nor the majority opinion in this case, establish any criteria to define what is referred to as a "national market." The words "national market" invoke the image of something like the New York Stock Exchange, the Chicago Board of Trade, or the Commodities and Futures Exchange. These are national markets which operate through brokers and dealers to bring buyers and sellers together and produce an established range of bid and ask prices as reflected by current transactions in the item being traded. It seems to me that at the very least, a "national market" requires a product or commodity which has a high degree of fungibility. For example, a share of stock in U.S. Steel can be sold on a national market by a seller in California to a buyer in New York in reliance upon the fact that the share of stock represents the same thing in both places. Similarly, a bushel of wheat grown in Nebraska will be the same as a bushel of wheat grown in Kansas once the farmers who grew each bushel have moved them into the national market. There is nothing in the *Congressional Record* that establishes that one abortion procedure is just like every other abortion procedure. To the contrary, an abortion is a unique, personal, and highly individualized procedure.

In addition to fungibility, a primary function of a "national market" is to determine a unit price for each commodity based upon the most recent sales of that commodity, without distinction as to whether that commodity was grown or manufactured in Texas or was grown or manufactured in Michigan. The majority says that "*Wickard* itself offered, as a limiting principal, the national wheat market" and "*Perez* cited the national market for commercial credit." *See ante* at 19. But there is a serious distinction between those types of national markets and a "national market in abortion-related services." An abortion is a medical/surgical procedure performed in a hospital or clinic by a provider on a pregnant woman. There is no product or commodity which results from this procedure. When a woman arranges to have an abortion performed, the subject of the arrangement is a personal service that is to be provided. When the service is rendered and the fee is paid, the abortion has no ongoing value or marketability.

I recognize, of course, that the majority has concluded that Congress found a national market for abortion services. *See ante* at 22-24. I question the factual accuracy of this conclusion. The only findings which the full Congress made relating to FACE are those identified in the Conference Committee Report. *See ante* 5 n.2. Because the Conference Committee made these express findings, we are bound to view these findings as the only findings which Congress made. Therefore, in determining whether Congress found a national market for abortion services, we can look only to the Conference Committee Report and the findings set forth therein.

46

The words "national market for abortion-related services" do not appear anywhere in these five Conference Committee findings. The only one of these five findings which even mentions the term "interstate commerce" is the third one, which states simply that anti-abortion violence "burdens interstate commerce by forcing patients to travel from states where their access to reproductive health services is obstructed to other states." H.R. CONF. REP. NO. 103-488, at 7 (1994), *reprinted in* 1994 U.S.C.C.A.N. 724, 724. The mere fact that some individuals choose to or are forced to travel interstate to receive abortions does not establish that there is a "national market" for abortions. Nothing in the Conference Committee's statement of findings speaks to whether abortion services are fungible, and nothing in this finding speaks to the question of whether the price or availability of abortion services in New York City is the same as that in Los Angeles or in Des Moines, Iowa.

For the foregoing reasons, I do not agree that the presence of a national market is the relevant inquiry under part three of the *Lopez* analysis. Furthermore, assuming that the presence of a national market is determinative, I am unable to concur in the majority's conclusion that Congress found a "national market for abortion-related services," which is the keystone of the majority's determination that FACE is a permissible exercise of Congress's power under the Commerce Clause as described in part three of *Lopez*.

In my view, FACE cannot survive *Lopez* analysis because the statute is distinguishable from the permissible regulations of conduct that substantially affects interstate commerce in four important aspects.  First, FACE is a criminal statute that by its terms has nothing to do with commerce.  *See Lopez*, 514 U.S. at 560-61.  Second, FACE is not an essential part of any larger regulation of economic activity, in which that larger regulatory scheme could be undercut unless the intrastate activity were regulated.  *See id.* at 561.  Third, FACE contains no jurisdictional element which would ensure through case-by-case inquiry that the conduct prohibited therein affects interstate commerce.  *See id.*  Finally, FACE exercises general police powers by creating criminal sanctions in an area where the states have historically been recognized to be sovereign.  *See id.* at 564-65.  These four departures from the *Lopez* standard are fatal to the constitutionality of FACE.

**A.  *FACE Is a Criminal Statute That by Its Terms Has Nothing to Do with Commerce.***

The statutory text of FACE does not contain the word "commerce," nor the phrase "intrastate commerce," nor the phrase "interstate commerce."  The conduct prohibited by FACE—the use of force to interfere with another person's obtaining or providing reproductive health services—does not inherently involve conduct which is a part of any commercial activity.  In fact, the prohibitions of FACE apply to a nonprofit, charitable facility that provides abortions for free just as they apply to a clinic that

charges a fee for providing abortion services.

Also, the prohibited conduct does not have any commercial purpose of its own. The commercial nature of the regulated activity is an important consideration in the substantially-affects prong of the *Lopez* analysis. *See, e.g.*, *Lopez*, 514 U.S. at 560 ("Where *economic activity* substantially affects interstate commerce, legislation regulating that activity will be sustained." (emphasis supplied)). The activity regulated by FACE, the use of force, threats, or intimidation to injure, intimidate, or interfere with the persons identified by the statute, is behavior that is not commercial by nature.

Despite the majority's protest to the contrary, *see ante* at 21 n.13, there is no difference between the prohibitions in FACE and a statute that might federalize murder on the grounds that killing people substantially affects interstate commerce. The majority's suggested distinction, that the FACE prohibitions have "a relatively narrow common goal or motivation and are all directed at a relatively narrow common set of victims, and further . . . many of the proscribed offenses involve common perpetrators traveling in interstate commerce and victims engaged in interstate commerce," *ante* at 21 n.13, is untenable. Our panel is in agreement that FACE does not fall within part two of the *Lopez* analysis, the prong for persons or things in interstate commerce. Yet the majority's purported distinction relies on the presumed involvement of "perpetrators engaged" and "victims engaged" *in* interstate commerce. As the majority itself notes, "[c]ongressional

49

regulation or protection of persons or things that move in interstate commerce must ensure that, in fact, a particular 'threat'—whether posed by an interstate or intrastate activity—actually threatens persons or things with a plain and clear nexus to interstate commerce." *Ante* at 12. FACE contains no such "jurisdictional nexus."

The approval of legislation like FACE opens the door to general federalization of felonies. *Lopez* reaffirms that this sort of legislation is not envisioned by the Commerce Clause. The criminalization of noncommercial conduct by FACE is one important distinction between FACE and the category of legislation described in part three of *Lopez*.

**B. FACE Is Not an Essential Part of a Larger Regulation of Economic Activity, in Which the Regulatory Scheme Could Be Undercut Unless the Intrastate Activities Were Regulated.**

There is no national regulatory scheme regarding the provision of abortion services. The federal government does not license abortion clinics, does not approve the training of abortion providers, and does not regulate the delivery of abortion services to ensure that any minimum health standards are met. The federal government has not created any administrative agency nor designated any department of the federal government to regulate the abortion industry in order to stabilize the supply of abortion services or encourage the demand for such services.

In short, there is no general federal regulatory scheme relating to the abortion industry. Congress has made no finding to

50

the contrary.  FACE cannot, therefore, be an essential part of any general federal regulatory scheme, because none exists.  It thus goes without saying that the prohibited conduct in FACE does not, as *Lopez* requires, undercut the enforcement of any general regulatory scheme.

The majority recognizes the importance of this factor when it quotes the operative language at the very beginning of its section I(3), discussing the substantially-affects category of Commerce Clause power.  *Ante* at 15 (quoting *Lopez*, 514 U.S. at 561).  But the majority then proceeds to try to rationalize its way around this specific language of *Lopez* by citing three earlier Supreme Court opinions for the proposition that Congress can regulate noncommercial local activity which "in the aggregate" substantially affects interstate commerce: *United States v. Darby*, 312 U.S. 100 (1941); *Wickard v. Filburn*, 317 U.S. 111 (1942); and *Perez v. United States*, 402 U.S. 146 (1971).

These three cases demonstrate the correctness of the *Lopez* premise rather than an exception to it.  In each of these cases there was a comprehensive national regulatory scheme, and the criminalized conduct was clearly defined as part of that regulatory scheme.  In *Darby*, the Supreme Court dealt with the wage and hour laws of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*.  The defendant was an employer who failed to pay the statutory minimum wages but went ahead and shipped his product in interstate commerce.  In *Wickard*, the Agricultural Adjustment Act of 1938 ("AAA") was at issue.  Filburn was a farmer whose farm fell under

51

the purview of the AAA and who had received an acreage allotment under the AAA. The AAA expressly limited the ability of farmers to raise a wheat crop for their own consumption and the **Wickard** case validated that limitation. Finally, **Perez** arose in the context of the Consumer Credit Protection Act, 18 U.S.C. § 891, with the defendant being a loan shark who engaged in extortionate credit transactions as therein defined. These cases deal directly with conduct that might frustrate the efforts of a federal regulatory system.

While I agree with the majority that **Lopez**'s reaffirmation of the **Wickard**-**Perez** cases can be read as meaning that Congress can "regulate noncommercial, intrastate activity that substantially affects interstate commerce," *ante* at 17, I see nothing in **Lopez** that permits the elimination of the further requirement that such "noncommercial, intrastate activity" must be "an essential part of a larger regulation of economic activity." **Lopez**, 514 U.S. at 561. FACE stands alone as a criminal statute, unconnected to any larger federal regulatory scheme. The statute purports to regulate intrastate noncommercial activities and thus fails, for the reasons noted above, to satisfy this requirement of **Lopez**.


**C. FACE Contains No Jurisdictional Element Which Would Ensure, Through Case-by-Case Inquiry, That The Prohibited Conduct Has a Substantial Effect on Interstate Commerce.**

It would have been a simple matter for Congress to have included elements in FACE which would have provided a "jurisdictional nexus." These elements are ones which explicitly

tie the prohibited conduct in a criminal statute to interstate commerce. The absence of a jurisdictional nexus was an important factor in the Supreme Court's disapproval of the Gun-Free School Zones Act in *Lopez*. *See Lopez*, 514 U.S. at 561-62.

The simplicity with which FACE could have been jurisdictionally limited is easily demonstrated. For example, the statute defines the term "facility" as meaning "a hospital, clinic, physician's office, or other facility that provides reproductive health services, and includes the building or structure in which the facility is located." 18 U.S.C. § 248(e)(1). Congress could have qualified the definition by limiting it to facilities that provide reproductive health services "to a person who has traveled in interstate commerce in order to receive such services." Likewise, in § 248(a) ("Prohibited activities"), Congress could have limited its prohibition to the use of force or physical obstruction to injure, intimidate, or interfere with any person who has traveled in interstate commerce to receive or provide abortion services.

For whatever reason, Congress opted not to include jurisdictional elements. As a consequence, this is yet another factor that distinguishes FACE from the category of legislation permitted as regulation of intrastate activity which substantially affects interstate commerce.

**D. FACE Intrudes on Issues Which Are Historically Local Concerns and Outside the Regulatory Power of the Federal Government Under the Interstate Commerce Clause.**

53

The regulation of violent actions by one person against another through criminal laws is the most elemental component of general police power. The prohibited conduct in FACE—the use of force, threats of force, or physical obstruction to intentionally injure, intimidate, or interfere with another person—are well within the classic type of prohibitions which a state exercising its general police power may adopt. In its *Lopez* decision, the Supreme Court repeatedly indicated that the Congress does not have a general police power and that such power rests exclusively with the states. *See Lopez,* 514 U.S. at 561 n.3 ("Under our federal system, the '"States possess primary authority for defining and enforcing the criminal law."'" (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993) (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982)))); *id*. at 564 ("Under the theories that the Government presents . . . it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign."); *id.* at 566 ("The Constitution . . . withhold[s] from Congress a plenary police power that would authorize enactment of every type of legislation." (citing U.S. CONST., art. 1, § 8)); *id*. at 567 ("[T]o uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States.").

The Congress was obviously motivated to enact FACE by the desire to protect persons seeking to obtain or perform abortion

services.  But this area is distinctly within the province of local law.  The *Lopez* Court considered family law to be the quintessential example of such a local concern, *see id.* at 564, and the action of obtaining an abortion results from what is essentially a family decision.  That the regulation of abortion in particular is a local issue is borne out by the history.  Before *Roe v. Wade*, 410 U.S. 113 (1973), the states were prohibiting and regulating abortions by state statute.  In holding these state statutes unconstitutional, the Supreme Court grounded its decisions in the liberty or privacy elements of the First and Fifth Amendments as made applicable to the states by the Fourteenth Amendment.  *See Roe*, 410 U.S. at 152-53.  Neither in *Roe* nor in any of its progeny did the Supreme Court ever mention the Commerce Clause (or the dormant commerce clause), nor did the Supreme Court suggest that these state statutes were unconstitutional because of their intrusion on interstate commerce nor upon any "national market" in the delivery of abortion services.  Even today, in the wake of *Roe* and *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), many states have statutes which regulate the circumstances of access to abortions and the conditions under which abortions may be delivered.  The federal government has no such general abortion regulation.

Both the regulation of violent acts among citizens and the regulation of abortion services are areas of distinctively local concern.  The prohibitions imposed by FACE bear all of the characteristics of enactments of police power.  *Lopez* explicitly

55

warns against this variety of legislative excess, making this factor yet one more important distinction between FACE and the laws which have been approved as permissible regulations of intrastate conduct that substantially affects interstate commerce.

### E.   FACE Is Unconstitutional.

Since FACE has the same defects and deficiencies which led the Supreme Court to conclude in *Lopez* that the Gun-Free School Zones Act was unconstitutional, I would hold that FACE is likewise unconstitutional.   It is not clear whether each of these four distinctions, standing alone, would exclude legislation from the third category of Commerce Clause legislation identified in *Lopez*. As the *Lopez* Court itself noted, "[t]hese are not precise formulations, and in the nature of things they cannot be." *Lopez*, 514 U.S. at 567.   However, the presence of all four of the above-detailed factors in this case leaves no doubt that FACE is unconstitutional.

III.

Because the majority concludes that the Commerce Clause gave Congress the requisite authority to adopt FACE, they "pretermit the substantially more questionable assertion of congressional authority [under Section Five of the Fourteenth Amendment] to criminalize purely private conduct (not directed at state property or facilities)."   *Ante* at 31.   Since I would conclude that the Commerce Clause does not permit Congress's passage of FACE, and

56

since supporting FACE under Section Five of the Fourteenth Amendment was clearly raised in this appeal, I am not at liberty to pretermit the latter question. However, in light of well-established principles which were recently reaffirmed by the Supreme Court's decision in *City of Boerne v. Flores*, 117 S. Ct. 2157 (1997), I conclude that Section Five of the Fourteenth Amendment does not empower Congress to enact FACE.

FACE purports to criminalize the conduct of private parties for conduct which is not directed at state property or facilities. Plainly, Section Five of the Fourteenth Amendment does not contemplate the passage of such a law. It provides that "Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." U.S. CONST. amend. XIV, § 5. The "provisions" which Section Five empowers Congress to enforce are directed at the states. *See* U.S. CONST. amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."). As the Supreme Court made clear in *City of Boerne*, Section Five of the Fourteenth Amendment "did not authorize Congress to pass 'general legislation upon the rights of the citizen, but corrective legislation; that is, such as may be necessary and proper for counteracting such laws as the states may adopt or enforce, and which, by the amendment, they are prohibited from making or enforcing.'" *City of Boerne*, 117 S. Ct. at 2166 (quoting *The Civil Rights Cases*, 109 U.S. 3, 13-14 (1883)). Section Five thus was not intended to confer on the federal government a police power over all matters related to the

57

individual rights contemplated by the Fourteenth Amendment.

After *City of Boerne*, it is clear that acts passed pursuant to Section Five must be remedial in nature. This is not the case with FACE, which seeks to vindicate Fourteenth Amendment rights through direct legislation affecting individual conduct, rather than by providing a remedy for state violations. Thus, the enactment of FACE cannot be justified as an exercise of the enforcement power under the Fourteenth Amendment.

It is interesting to note that the same Congress which passed FACE also passed the Religious Freedom Restoration Act of 1993, 107 Stat. 1488 (former 42 U.S.C. § 2000bb *et seq.*) (hereinafter, "RFRA"), the statute at issue in *City of Boerne*. With each of these laws, Congress was attempting to change through legislation the result of a prior Supreme Court decision: with FACE, that prior decision was *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993); and with RFRA, it was *Employment Division v. Smith*, 494 U.S. 872 (1990). Just as the Supreme Court in *Lopez* explained the limits on Commerce Clause powers, so too did it in *City of Boerne* explain the limitations on the powers bestowed by Section Five of the Fourteenth Amendment. Both *Lopez* and *City of Boerne* reflect what I believe to be a significant trend on the part of the Supreme Court in articulating a renewed consciousness of the fundamental principles of our Constitution, that is, that our federal government is a government of limited powers, federalism has a significant place in constitutional analysis, and the separation of powers between the branches of the federal government must be

58

respected.

## IV.

For these reasons, I respectfully dissent from the majority's conclusion that FACE is constitutional.