Christina BERGERON

v.

Paul BERGERON, et al.

No. Civ.A. 96–3445–A.

United States District Court,
M.D. Louisiana.

May 28, 1999.

Richard Lynn Ducote, Fine & Associates, New Orleans, Louisiana, for plaintiff.

G. Allen Walsh, Baton Rouge, LA, for Paul Bergeron, defendent.

Lauren J. Davis, Guglielmo, Marks, Schutte, Terhoeve & Love, Baton Rouge, LA, G. Allen Walsh, Baton Rouge, LA, Donald R. Smith, Smith & Davis, Baton Rouge, LA, for Sandra Purpera, defendant.

James Rodney Chastain, Jr., Jeanne C. Comeaux, Breazeale, Sachse & Wilson, Baton Rouge, LA, for Amy Lindsly, defendant.

Honorable L.J. Hymel, United States Attorney, MDLA, John Joseph Gaupp, Assistant U.S. Attorney, Baton Rouge, LA, for U.S., Intervenor–plaintiff.

## REVISED RULING ON MOTION TO DISMISS

JOHN V. PARKER, Chief Judge.

The ruling dated May 26, 1999 (doc. no. 114) is hereby revised so as to read as follows:

This matter is before the court on a motion by defendant Paul Bergeron to dismiss on constitutional grounds. Oppositions have been filed by plaintiff and by the United States, as intervenor.[1] There is no need for oral argument. Jurisdiction is based upon 28 U.S.C. § 1331.

Christina Bergeron brings this action under Subtitle C of the Violence Against Women Act (the "Act"), 42 U.S.C. § 13981. Plaintiff claims that, during her marriage, her former husband, Paul Bergeron, repeatedly subjected her to crimes of violence motivated by gender from the period of January 1, 1995, through August 30, 1996.[2] According to the complaint, Paul Bergeron committed the crimes of simple battery, aggravated battery, attempted forcible rape, and aggravated assault during that time frame.

The court has previously denied a motion by plaintiff for summary judgment made upon statutory grounds. More specifically, the court has found that there are genuine issues of material fact relating to the claim that Paul Bergeron committed acts constituting a crime of violence motivated by gender, i.e. an alleged attempted forcible rape on August 30, 1996.[3] The court now considers the motion made by Bergeron to dismiss plaintiff's claims on the grounds that § 13981 is unconstitutional.

*Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed.60 (1803) long ago settled the question that under our written Constitution courts of the United States must review and decide constitutional challenges to legislation:

> "It is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. at 177, 1 Cranch 137.

### Background

In 1994, Congress enacted the Violence Against Women Act to address "the escalating problem of violent crimes against women." Sen.Rep. No. 103–138 at 37 (1993). Congress additionally authorized $1.6 billion in federal spending over a six year period to support local efforts to reduce violence against women. Among other things, the Act affords a civil rights remedy to victims of gender-motivated violence "to promote public safety, health, and activities affecting interstate commerce". 42 U.S.C. § 13981(a). As provided by § 13981(b): "All persons within the United States shall have the right to be free from crimes of violence motivated by gender." Section 13981(c) affords victims of such violent crimes a cause of action for compensatory and punitive damages as follows:

> A person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate. 42 U.S.C. § 13981(c).

1. The court having certified to the attorney general that the constitutionality of the Act is drawn in question, the United States intervened under 28 U.S.C. § 2403(a).

2. The Bergerons were married in September of 1995. The couple physically separated in June of 1996 and they obtained a divorce in January of 1997.

3. On September 29, 1998, the court dismissed plaintiff's claims against Paul Bergeron's mother and sister. The court additionally ruled that the only viable claim against Paul Bergeron under the Act is the attempted forcible rape and that plaintiff does state a claim under Section 13981. (Doc. no. 108)

The phrase "crime of violence motivated by gender" is defined as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." § 13981(d)(1). The term "crime of violence" is defined as an act or series of acts that would constitute a felony under state or federal law and that has as an element of the offense "the use, attempted use, or threatened use of physical force".[4] The civil rights remedy provided by the Act specifically excludes "random acts of violence unrelated to gender" and "acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender". 42 U.S.C. § 13981(e)(1).

## Motion to Dismiss on Constitutional Grounds

The Constitution of the United States is a charter by which the people grant certain limited and enumerated powers to the national government. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Constitution, Amendment X.

Accordingly, every action undertaken by any branch of the federal government must find authorization in the Constitution. If the action is not so authorized, it cannot stand.

Chief Justice Marshall carefully explained this basic premise in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed.2d 60 (1803).

> That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis on which the whole American fabric has been erected.... The principles, ... so estab-

lished are deemed fundamental. And as authority, from which they proceed, is supreme, ... they are designed to be permanent.

> This original and supreme will organizes the government, and assigns to different departments their respective powers. It may either stop here; or establish certain limits not to be transcended by those departments.

> The government of the United States is of the latter description. The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing; if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, ... It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act.

5 U.S. at 176, 1 Cranch 137.

The Act of Congress here challenged must therefore, be predicated upon some power conferred upon Congress in that Constitution.

Section 13981(a) declares that it is enacted "[p]ursuant to the affirmative power of Congress ... under section 5 of the Fourteenth Amendment to the Constitution as well as under section 8 of Article I of the Constitution."

Defendant moves to dismiss the complaint on the grounds that it fails to state a legally cognizable cause of action. Defendant contends that § 13981 is neither a

---

**4.** "Crime of violence" means "an act or series of acts that would constitute a felony against the person or ... a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses de-

scribed in section 16 of Title 18...." 42 U.S.C. § 13981(d)(2)(A). Section 16 of Title 18 defines "crime of violence" as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another..."

valid exercise of congressional authority under the Commerce Clause, nor a legitimate use of its enforcement powers under the Fourteenth Amendment.

**Arguments**

Relying upon the Commerce Clause analysis employed by the Supreme Court in *Lopez*,[5] defendant contends that Congress exceeded its powers in enacting § 13981. Defendant argues that § 13981 is "at heart an attempt to regulate criminal activity"; it regulates private, non-commercial conduct having nothing to do with commerce; it contains no jurisdictional element to ensure that, on a case by case basis, the specific activity bears the necessary substantial affect on interstate commerce; and that the arguments used by Congress in finding a substantial impact on interstate commerce are "window dressing" and/or precisely those "costs of crime" arguments rejected by the court in *Lopez*. Additionally, defendant contends that § 13981 violates principles of federalism by reaching private domestic disputes, invading an area that has been traditionally been a matter of state law.

According to defendant, the cases upholding the constitutionality of § 13981[6] have failed to heed the teachings of *Lopez*. Defendant argues that those cases have blindly accepted congressional findings that gender-based violence substantially effects interstate commerce and improperly rely upon a cost of crime analysis in calculating the effects of non-economic activity. Defendant suggests that the only court to properly follow *Lopez* has struck down § 13981 on the basis that it regulates non-economic activity and lacks a jurisdictional element to ensure that the specific activity regulated in fact affects interstate commerce. *Brzonkala v. Virginia Polytechnic Institute and State University*, 169 F.3d 820 (4th Cir.1999) (on rehearing en banc). Defendant argues that the Fourth Circuit correctly concludes that the connection between gender-motivated violence and commerce or any sort of economic enterprise is too tenuous to be validly regulated under the Commerce Clause.

Additionally, while Congress may enact legislation to enforce the provisions of the Fourteenth Amendment, defendant argues that § 13981 does not attempt to remedy any state violations of the equal protection clause. Consequently, defendant contends that § 13981 creates a substantive right against purely private actors and that as such it lies outside the scope of the Fourteenth Amendment.

In opposition, plaintiff and the government argue that § 13981 is a legitimate exercise of congressional authority under the Commerce Clause. Opponents observe that Congress has conducted extensive hearings over a period of four years and found that gender-motivated violence is pervasive and that it has "a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce". H.R.Rep. No. 103–711, 103d Cong., 2d Sess., 385 (1994). Opponents contend that the congressional findings amply show that there is a substantial impact on the national economy as a result of violence against women.

According to the government, *Lopez* does not require a statute to regulate economic activity in order to be upheld under the Commerce Clause. As long as there is a rational basis supporting the legislative judgment that the activity substantially affects interstate commerce, the government contends that there is no question that Congress may regulate intrastate, noncom-

---

5. *U.S. v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

6. Defendants cite *Crisonino v. New York City Housing Authority*, 985 F.Supp. 385 (S.D.N.Y. 1997); *Anisimov v. Lake*, 982 F.Supp. 531 (N.D.Ill.1997); *Seaton v. Seaton*, 971 F.Supp. 1188 (E.D.Tenn.1997); *Doe v. Hartz*, 970 F.Supp. 1375 (N.D.Iowa 1997), rev'd on other grounds, 134 F.3d 1339 (8th Cir.1998); *Doe v. Doe*, 929 F.Supp. 608 (D.Conn.1996).

mercial conduct. The government argues that the connection with interstate commerce is "direct and expressly declared in a massive legislative record" in stark contrast to the situation in *Lopez*. Hence, it is argued that Congress had a rational basis for concluding that discriminatory violence against women substantially affects interstate commerce by making women less likely to engage in interstate travel and by curtailing their participation in job market and other activities affecting interstate commerce.

Additionally, the government contends that Congress has examined an extensive record of evidence, including numerous reports of state task forces which have reached the same conclusion—"that crimes disproportionately affecting women are often treated less seriously than comparable crimes against men." S.Rep. No. 102–197 at 43. In view of the recorded findings that states do not offer adequate protection from gender-based crimes, the government contends that a federal civil rights remedy is a reasonable response to the problem of gender-based crime. There can be no threat to the principles of federalism, the government argues, when the declared purpose of the statute is to secure civil rights of victims that the states have failed to protect. In other words, Congress may properly supplement (rather than displace) state law to protect civil rights and to root out discrimination.

For much the same reasons, the government argues that § 13981 is a valid exercise of Congress' powers under Section Five of the Fourteenth Amendment. In particular, the government relies upon the legislative "finding" that " 'the criminal justice system is not providing equal protection of the laws [to] women in the classic sense.' " S.Rep. No. 103–138 at 55 (quoting testimony of Professor Cass Sunstein before the Senate Judiciary Committee). Consequently, the government contends that § 13981 is an appropriate enforcement action for ending unconstitutional state action.

## Commerce Clause Analysis

■ Congress has the power to regulate commerce among the several states pursuant to Article I, Section 8, Clause 3 of the United States Constitution. It is well established that there are three broad categories of activities subject to congressional regulation under the Commerce Clause: (1) Congress may regulate the use of the channels of interstate commerce; (2) Congress may regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) Congress may regulate those activities having a substantial relation to interstate commerce. *Lopez, supra*. The category that is applicable here is the third one, pertaining to activities that substantially affect interstate commerce.

In *Lopez*, the Supreme Court struck down the Gun Free School Zones Act, 18 U.S.C. § 922(q), which made it a federal crime to knowingly possess a firearm in a school zone. Recognizing that the Constitution creates a federal government of specific, enumerated powers, the Supreme Court found that Congress had exceeded its powers under the Commerce Clause in enacting § 922(q). Examining the progression of Commerce Clause cases from the year 1824 onward, the Court noted that the proper test "requires an analysis of whether the regulated activity 'substantially affects interstate commerce' ". *Id.* at 1630.

In *Lopez*, the Court considered the following factors. Section 922(q) "is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise". *Id.* at 1631. The statute is "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* at 1631. Section 922(q) "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* Neither the statute nor the legislative history contained any

express legislative findings regarding the effects upon interstate commerce of gun possession in a school zone. The Court did, however, indicate that congressional findings could have provided a basis for upholding the statute "even though no such substantial effect was visible to the naked eye." *Id.* at 1632.

Finally, the Court rejected the government's "costs of crime" [7] and "national productivity" [8] arguments as being so tenuous that, if accepted, it would be "difficult to perceive any limitation on federal power". *Id.* The Court cautioned that the power of Congress to enact legislation under the Commerce Clause must be interpreted as having "judicially enforceable outer limits". *Id.* at 1628, 1633. Ultimately, the Court refused to "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.*, 115 S.Ct. at 1634.

While *Lopez* establishes that there is an outer limit to congressional authority under the Commerce Clause, the Supreme Court "did not purport to eliminate or erode well-established Commerce Clause precedents." *U.S. v. Knutson*, 113 F.3d 27, 29 (5th Cir.1997). *Lopez* leaves intact the proposition set forth in *Wickard v. Filburn*[9] concerning congressional regulation of intrastate, noncommercial activity:

" '[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts

a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as "direct" or "indirect." ' " *Lopez*, 514 U.S. at 556, 115 S.Ct. at 1628 (quoting *Wickard*, 317 U.S. 111, 120–22, 63 S.Ct. 82, 87, 87 L.Ed. 122 (1942)).

Consequently, Congress may regulate noncommercial, intrastate activity that substantially affects interstate commerce. *U.S. v. Bird*, 124 F.3d 667, 676 (5th Cir. 1997), cert. denied, —— U.S. ——, 118 S.Ct. 1189, 140 L.Ed.2d 320 (1998). "The question remains in any given case, however, whether Congress's exercise of power in this manner is properly limited." *Id.* In this context, " 'substantial' must be understood to have reference not only to a quantitative measure but also to qualitative ones". *Bird, supra,* at p. 677, n. 11. While the regulated conduct may generically constitute a "class of activities" which may "substantially affect" interstate commerce in a broad and general sense, the proscribed intrastate activity must, when taken in context, substantially affect interstate commerce. *Bird, supra.*

■ While courts must not "take congressional invocations of the commerce power at face value," the courts should nevertheless afford Commerce Clause legislation a "significant degree of judicial deference." *U.S. v. Robinson*, 119 F.3d 1205, 1210 (5th Cir.1997), cert. denied, —— U.S. ——, 118 S.Ct. 1104, 140 L.Ed.2d 158

---

**7.** The Government argued that possession of a firearm in a school zone might result in violent crime and that violent crime could be expected to impact the national economy in two ways. "First, the costs of violent crime are substantial, and, through the mechanism of insurance, those costs are spread throughout the population... Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe." *Id.* at 1632 (citations omitted).

**8.** The Government argued that the presence of guns in schools "poses a substantial threat

to the educational process by threatening the learning environment. A handicapped educational process, in turn, will result in a less productive citizenry. That, in turn, would have an adverse effect on the Nation's economic well-being." *Id.* at 1632.

**9.** According to the Fifth Circuit, *Lopez* "expressly reaffirmed" *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). *U.S. v. Bird,* 124 F.3d 667 (5th Cir.1997), cert. denied, —— U.S. ——, 118 S.Ct. 1189, 140 L.Ed.2d 320 (1998).

(1998). Judicial deference is particularly warranted when there have been months of legislative hearings, research and debate on the regulated activity's impact on interstate commerce. *See, Bird, supra* at 678.

Thus, in the wake of *Lopez*, the proper standard of review remains the "is rational basis test". *Robinson* at 1210. However, as the Fifth Circuit explains:

> We think *Lopez* makes clear that legislation concerning an intrastate activity will be upheld if Congress could rationally have concluded that the activity, in isolation or in the aggregate, substantially affects interstate commerce. This standard will almost certainly be met if a statutory jurisdictional element ensures that an effect on interstate commerce must be proved in each case. Even in the absence of such a statutory requirement, we will uphold the challenged statute if the regulated conduct's connection to interstate commerce is manifest, i.e., 'visible to the naked eye.' **If we do not readily perceive a clear connection to interstate commerce, we may nevertheless uphold the statute if the nexus is satisfactorily explained by congressional findings or the legislative history.** Conversely, if the statute, the congressional findings, and the legislative history provide no rational basis for concluding that the regulated activity has the required nexus to interstate commerce, the statute must fall. *Robinson* at 1211–12. (Emphasis added.)

■ Under the jurisprudence, this court's inquiry is two-fold: (1) whether a rational basis exists for the findings that the regulated activity substantially affects interstate commerce, and (2) whether the means chosen by Congress are "reasonably adapted to the end permitted by the Constitution." *Deer Park Independent School Dist. v. Harris County Appraisal Dist.*, 132 F.3d 1095, 1098 (5th Cir.1998), cert. denied, —— U.S. ——, 118 S.Ct. 2343, 141 L.Ed.2d 714 (1998).

■ While the Fifth Circuit has yet to consider the constitutionality of the civil rights remedy afforded by the Act, several district courts have published decisions rejecting constitutional challenges to § 13981. *Liu v. Striuli*, 36 F.Supp.2d 452 (D.R.I.1999); *Ziegler v. Ziegler*, 28 F.Supp.2d 601 (E.D.Wash.1998); *Crisonino v. New York City Housing Authority*, 985 F.Supp. 385 (S.D.N.Y.1997); *Anisimov v. Lake*, 982 F.Supp. 531 (N.D.Ill.1997); *Seaton v. Seaton*, 971 F.Supp. 1188 (E.D.Tenn.1997); *Doe v. Hartz*, 970 F.Supp. 1375 (N.D.Iowa 1997), rev'd on other grounds, 134 F.3d 1339 (8th Cir. 1998); *Doe v. Doe*, 929 F.Supp. 608 (D.Conn.1996).

However, the Fourth Circuit, the first appellate court to consider the issue, has recently held that Congress exceeded its powers under the Commerce Clause by enacting the civil remedy provision of the Violence Against Women Act. *Brzonkala v. Virginia Polytechnic Institute and State University*, 169 F.3d 820 (4th Cir.1999) (on rehearing en banc). According to the Fourth Circuit, *Lopez* "at least presumptively" limits the power of Congress under the Commerce Clause to enact statutes that either: (1) "arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce"; or (2) include a jurisdictional element whereby it can be determined on a case-by-case basis that the regulated activity will indeed affect interstate commerce. There was no question that § 13981 lacks the second criteria, i.e. a jurisdictional element.

After much discussion of the first criteria, the Fourth Circuit concludes that the statute lacks any meaningful connection with commerce or any sort of economic enterprise. As the court further observes, § 13981:

> ... explicitly excludes from its purview those violent crimes most likely to have an economic aspect—crimes arising solely from economic motives—and instead addresses violent crime arising from the

irrational motive of gender animus, a type of crime relatively unlikely to have any economic character at all. 169 F.3d at 834.

The Fourth Circuit further rejected the idea that § 13981 could be sustained under the line of jurisprudence upholding "regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." In the court's opinion, § 13891 could not be considered "an essential part of a larger regulation of economic activity" (i.e. Title VII):

> ... Although section 13981 addresses private discrimination, and other laws address discrimination in clearly economic contexts, the federal patchwork of antidiscrimination laws can hardly be characterized as a single, interdependent regulatory scheme aimed at commercial or economic activity ... [S]ection 13981 and Title VII—the statute to which the report apparently refers—cannot reasonably be said to constitute a unified statutory scheme. While the two statutes share a general concern with discrimination, they address different kinds of conduct that only occasionally overlap—gender-motivated violence on the one hand, employer discrimination on the other. Rather than creating an integrated regulatory scheme, each statute is obviously written without regard for the concerns that animate the other. For example, section 13981 provides a remedy for gender-motivated violence in the workplace as well as on the street or at home, without regard for the victim's actual or potential employment status, and directly against the violent actor. Title VII, by contrast, provides a remedy only for gender discrimination that can be attributed to the fault of the employer, without regard to whether such discrimination takes the form of violent conduct, and it provides that remedy against the employer, who may or may not be the actual discriminator. *Id.* at 834–5.

The court then considered whether the "substantially affects test" could be met even though § 13981 regulates non-economic activity without any jurisdictional element, exceeding the "presumptive outer limits of congressional power." The court summarized the arguments made in favor of upholding the statute as follows:

> Echoing the government's arguments in *Lopez,* the appellants argue that violence motivated by gender animus imposes medical and legal costs upon its victims; discourages those who fear such violence from traveling, working, or transacting business at times or in places that they consider unsafe (thereby deterring some interstate travel, employment, and transactions); and, as a result, inhibits the productivity of its actual or potential victims and decreases the supply and demand for interstate products. See Br. of Appellant Brzonkala at 37; cf. Supp.Br. of Appellant Brzonkala at 3 (noting effects of gender-motivated violence "on employment, health care, housing, criminal justice, interstate travel and consumer spending").

> ... As in *Lopez,* appellants rely in essence on the costs of violent crime (including the deterrence of interstate travel and other similar interstate activities) and on decreased national productivity (including reduced employment, production, and demand), both of which ultimately affect the national economy, and presumably interstate commerce as well. *Id.* at 838.

These arguments were found to be the functional equivalent of the "cost of crime" and the "decreased national productivity" arguments rejected by the Supreme Court in *Lopez.* Hence, the Fourth Circuit likewise rejected these arguments, noting that acceptance of such arguments would effectively "remove all limits on federal authority". It would additionally constitute a "sweeping intrusion" into areas of traditional state concern, particularly as the

statute applies to domestic violence [10]:

> Moreover, it is undisputed that a primary focus of section 13981 is domestic violence, a type of violence that, perhaps more than any other, has traditionally been regulated not by Congress, but by the several States ... Though such violence is not itself an object of family law—an area of law that clearly rests at the heart of the traditional authority of the States ... issues of domestic violence frequently arise from the same facts that give rise to issues such as divorce and child custody, which lie at the very core of family law. Although section 13981 explicitly precludes the federal courts from exercising the supplemental jurisdiction that might otherwise extend to such matters, see 42 U.S.C. § 13981(e)(4), the fact that Congress found it necessary to include such a jurisdictional disclaimer confirms both the close factual proximity of the conduct regulated by section 13981 to the traditional objects of family law ...
>
> *Id.* at 842.

The court further rejected the appellants' arguments relative to the judiciary's role in conducting a "rational basis review" of congressional findings. Following *Lopez*, the court held that it was required to make an independent evaluation as to whether the substantially affects test was met, as this was ultimately a judicial rather than a legislative determination. After reviewing the legislative record, the court summarized its findings as follows:

> The legislative record in this case, considered as a whole, shows that violence against women is a sobering problem and also that such violence ultimately does take a toll on the national economy. The record also supports an inference that *some portion of this violence*, and the toll that it exacts, is attributable to gender animus. And Congress' specific findings regarding the relationship be-

tween gender-motivated violence and interstate commerce, though somewhat conclusory, cf. *Lopez*, 514 U.S. at 612 n. 2, 115 S.Ct. 1624, 131 L.Ed.2d 626 (Souter, J., dissenting) (noting that the findings added by Congress to the GFSZA were made "at such a conclusory level of generality as to add virtually nothing to the record"), depict the manner in which such violence affects interstate commerce—primarily by imposing medical, legal, and other costs upon its victims; by discouraging those who fear such violence from traveling, working, or transacting business at times or in places that they deem unsafe (thereby deterring some interstate travel, employment, and transactions); and, as a result, by inhibiting the productivity of its actual or potential victims and decreasing the supply and demand for interstate products. *Id.* at 851.

In addition to conclusory nature of the legislative findings, the court found that the identified relationship between gender-motivated violence and interstate commerce was simply too attenuated to withstand constitutional scrutiny. The court rejected the argument that because § 13981 regulates conduct implicating civil rights that this was an area of "quintessential federal responsibility". Ultimately, the Fourth Circuit reached the conclusion that there is no rational basis for the legislative findings that gender-motivated violence substantially affects interstate commerce. Otherwise, there would be no limit to congressional power under the Commerce Clause and Congress would be able to "assume control over the entire field of violent crime, or for that matter, all crime within all of the States." *Id.* at 859.

Having carefully considered the matter, this court finds that the proper standard of review is the "rational basis test". *Robinson,* supra at 1210–12. Thus, the question is whether Congress could have rationally

---

10. There can be no dispute that in the case at bar, plaintiff is attempting to apply the Act to a classic case of domestic violence since it involves a former husband and wife and incidents during marriage.

concluded that gender-motivated violence substantially affects interstate commerce. *Id.* As § 13981 lacks a jurisdictional element, the court initially considers whether there is any connection with interstate commerce which is manifest or readily apparent. *Id.* The court agrees with the Fourth Circuit that there is no manifest connection between the regulated conduct (particularly as it pertains to domestic violence) and interstate commerce. "Not only is violent crime motivated by gender animus not itself even arguably commercial or economic, it also lacks a meaningful connection with any particular, identifiable economic enterprise or transaction." *Brzonkala* at 834.

Consequently, the court must next consider whether the congressional findings or the legislative history furnish a rational basis for concluding that the substantially affects test has been met. Plaintiff and the government essentially rely upon the following "findings":

In a House Conference Report it was found that:

"[c]rimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce ... by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products."
H.R.Conf.Rep. No. 103–711, at 385 (1994), reprinted in 1994 U.S.C.C.A.N. 1839, 1853.

In its final report, the Senate found:
"Gender-based crimes and the fear of gender-based crimes restricts move-

ment, reduces employment opportunities, increases health expenditures, and reduces consumer spending, all of which affect interstate commerce and the national economy. Gender-based violence bars its most likely targets—women—from full participation in the national economy. For example, studies report that almost 50 percent of rape victims lose their jobs or are forced to quit in the aftermath of the crime. Even the fear of gender-based violence affects the economy because it deters women from taking jobs in certain areas or at certain hours that pose a significant risk of such violence.... For example, women often refuse higher paying night jobs in service/retail industries because of the fear of attack. Those fears are justified: the No. 1 reason why women die on the job is homicide and the highest concentration of those women is in service/retail industries .... 42 percent of deaths on the job of women are homicides; only 12 percent of the deaths of men on the job are homicides."

S.Rep. No. 103–138, at 54 & n. 70 (footnotes omitted).

The court concludes that these "findings" amount to generalized conclusions "which add virtually nothing to the record." Moreover, they are the "functional equivalent" of the "costs of crime" and "decreased national productivity" arguments that were rejected by the Supreme Court in *Lopez* as being too attenuated to withstand constitutional scrutiny. See, *Brzonkala,* supra. "[I]t cannot be doubted that if gender-motivated crime affects the economy, a fortiori all violent crime affects the economy." *Id.* at 859.

While the data set forth in the legislative history [11] clearly shows that gender-

---

11. Some of the data that Congress considered which specifically relates to domestic violence is as follows:

—"In 1991, at least 21,000 domestic crimes were reported to the police every week; at least 1.1 million reported assaults—includ-

ing aggravated assaults, rapes, and murders—were committed against women in their homes that year; unreported domestic crimes have been estimated to be more than three times this total." S.Rep. No. 103–138 at 37.

motivated violence against women is a serious problem (resulting in increased medical and other costs and decreased mobility and productivity of women generally and in the workplace), the same could be said about crime in general. If the data showing "costs of crime" and "decreased national productivity" provides a rational basis for finding that the substantially affects test has been met, then there is no outer limit to congressional authority under the Commerce Clause.

Ultimately, this court must recognize what the Supreme Court makes plain in *Lopez*—that the Constitution places an outer limit to congressional authority under the Commerce Clause. The determination of whether a particular activity substantially affects interstate commerce is "ultimately a judicial rather than a legislative question." *Lopez*, 115 S.Ct. at 1629. This court would have to disregard this fundamental constitutional principle to blindly accept the conclusory "findings" reached by Congress. Hence, the court concludes that Congress exceeded the bounds of its authority under the Commerce Clause by enacting § 13981.

This law is legislation regulating domestic violence, not commerce.

## EQUAL PROTECTION ANALYSIS

■ The court turns next to the even more doubtful assertion that § 13981 (which regulates purely private conduct) is a valid exercise of power under Section Five of the Fourteenth Amendment. Section Five provides that "Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5. In this case, plaintiff and the government contend that Congress was properly enforcing the equal protection provision of Section One of the Fourteenth Amendment: "**No State shall** . . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1 (emphasis added).

However, the equal protection clause which Congress is empowered to enforce, on its face, is directed at the states. Moreover, as made clear in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), statutes enacted pursuant to Section Five must be remedial in nature. This means that Congress has the power to make effective the substantive prohibitions against the states and state actors. Section Five does "not authorize Congress to pass 'general legislation upon the rights of the citizen, but corrective legislation; that is, such as may be necessary and proper for counteracting such laws as the states may adopt or enforce, and which, by the amendment, they are prohibited from making or enforcing.'" *City of Boerne*, 521 U.S. at ——, 117 S.Ct. at 2166 (quoting *The Civil Rights Cases*, 109 U.S. 3, 13–14, 3 S.Ct. 18, 22–24, 27 L.Ed. 835 (1883)).

Section Five does not grant the federal government general police powers over all

—The nation spends $5 to $10 billion a year on health care, criminal justice and other costs related to domestic violence. Id. at 41.

—"An estimated 4 million American women are battered each year by their husbands or partners. Approximately 95% of all domestic violence victims are women. About 35% of women visiting hospital emergency rooms are due to injuries sustained as a result of domestic violence. One study of battered women found that 63 percent of the victims had been beaten while they were pregnant." H.R.Rep. No. 103–395, at 26.

—Domestic violence costs employers between $3 to $5 billion annually as a result of absenteeism. 139 Cong.Rec. H10349–01, at H10365 (Nov. 20, 1997) (statement of Sally Goldfarb, NOW Legal Defense and Education Fund).

—Fear of gender-motivated violence deters women from using public transportation and "acts as a barrier to mobility, particularly for those women who have no alternative to public transportation because of economic constraints. If women are in fear of transportation, their employment opportunities are reduced." Testimony of Helen Neubourne, S.Hrg. 101–939, Pt. 1, at 69.

—"As many as 50 percent of homeless women and children are fleeing domestic violence." S.Rep. No. 101–545, at 37 (1990).

matters related to the individual rights addressed by the Fourteenth Amendment. *Lopez* and *City of Boerne* reaffirm "the fundamental principles of our Constitution, that is, that our federal government is a government of limited powers . . . and the separation of powers between the branches of the federal government must be respected." *U.S. v. Bird*, 124 F.3d 667, 691 (5th Cir.1997) (Judge DeMoss, concurring in part and dissenting in part).

In view of the foregoing, it is clear that § 13981 cannot be justified as an exercise of Congress' enforcement power under the Fourteenth Amendment. Section 13981 unquestionably regulates "purely private conduct, without any individualized showing of unconstitutional state action". See, *Brzonkala*, supra at p. 862. As the Fourth Circuit observes: "liability under section 13981 attaches without regard to whether the State adequately enforced its applicable criminal or civil laws." *Id.* at 869. As set forth by the Fourth Circuit in *Brzonkala*, not only the text but the legislative history of the Fourteenth Amendment and numerous Supreme Court rulings have firmly established that Congress exceeds the bounds of the enforcement clause of the Fourteenth Amendment when it regulates purely private conduct.

Nevertheless, the government argues that § 13981 should be upheld as a "plainly adapted" means to the legitimate end of remedying unconstitutional state action. This same argument was made in *Brzonkala* and flatly rejected:

Thus, although appellants concede, as they must, that wholly private acts of gender-motivated violence can never violate the Equal Protection Clause . . . they nonetheless contend that, under the *Katzenbach v. Morgan* and *South Carolina v. Katzenbach* line of cases, Congress may regulate such private violence as a means of remedying the bias and discrimination against women in the States' criminal justice systems, which "often deprive[ ] victims of crimes of violence motivated by gender of equal protection of the laws and there dress to which they are entitled," H.R.Conf.Rep. No. 103–711, at 385, reprinted in 1994 U.S.Code Cong. & Admin. News at 1853.

Appellants are doubtless correct that Congress may, pursuant to Section 5, prophylactically regulate or proscribe certain state conduct that does not violate Section 1 of the Fourteenth Amendment. In the prophylactic cases, however, the Court has only upheld federal statutes that prohibited state action; it has never upheld statutes, like section 13981, that prohibited private action. None of the prophylactic cases (nor any other Supreme Court case) holds or suggests that Congress may employ such a rationale to reach purely private conduct.

*Brzonkala* at 874.

Moreover, § 13891 is "neither aimed at violations of the Equal Protection Clause nor [is it] a closely tailored means of correcting any such violations." *Id.* at 883. Congress exceeds its enforcement powers when a statute "is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne* at 2170. Moreover, "[r]emedial legislation under § 5 'should be adapted to the mischief and wrong which the [Fourteenth] [A]mendment was intended to provide against.'" *Id.* (citing *Civil Rights Cases*, 109 U.S. at 13, 3 S.Ct. at 23.)

Section 13981 provides a remedy only against private individuals; it provides no remedy against equal protection violations by the states or state actors. Even if § 13891 could somehow be considered as an indirect or alternative means of remedying state discrimination, it would be "so out of proportion" to the remedial objective that it could not be fairly considered responsive to unconstitutional behavior. *Brzonkala* at 887–8.

For these reasons and those much more extensively provided by the Fourth Circuit in *Brzonkala,* the court holds that § 13981 is unconstitutional.

Accordingly, the motion by Paul Bergeron to dismiss on constitutional grounds (doc. no 34) is hereby GRANTED and this action shall be dismissed.